**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| JAMBYS, INC., ET AL., | Case No. 24-10913 (KBO) |
| Debtors.[1] | Jointly Administered |
| | |
| JAMBYS, INC., | Chapter 11 |
| Plaintiff, | Adv. Pro. No. 24-_____ (KBO) |
| v. | |
| VELOCITY CAPITAL GROUP LLC, UNITED FIRST, LLC, GLOBAL FUNDING EXPERTS, LLC, MCA SERVICING COMPANY, CLOUDFUND LLC, DELTA BRIDGE FUNDING, LLC, MAX RECOVERY GROUP LLC, SIMMONS CAPITAL PARTNERS, NEWCO CAPITAL GROUPS VI LLC, and SELLERSFUNDING CORP. d/b/a SELLERSFI, | |
| Defendants. | |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

Jambys, Inc. and Jambys NYC, Inc. (collectively, "Jambys" or the "Debtors"),[2] as the

debtors and debtors in possession in the above-captioned bankruptcy cases and plaintiffs in this

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are as follows: Jambys, Inc. (4264) and Jambys NYC, Inc. (5373).  The Debtors' mailing address is 228 Park Avenue South, PMB 49630, New York, NY 10003.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Declaration of John Ambrose in Support of First Day Relief* [*In re Jambys, Inc.*, No. 24-10913-KBO (Bankr. D. Del.) D.I. 8] (the "First Day Declaration").

adversary proceeding, allege for their Verified Complaint ("Complaint"), upon knowledge of their own acts and upon information and belief as to other matters, as follows:

## NATURE OF THE ACTION AND THE NEED FOR RELIEF

1.      This is an adversary proceeding brought pursuant to Rules 7001(1), 7002(2), 7001(7), 7001(9), and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and sections 105(a) and 362 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). By this adversary proceeding, Jambys seeks to extend the automatic stay to enjoin the prosecution of the Loan Actions (defined below) against the corporate owners, directors and officers of Jambys, John Tate Ambrose and Andrew Lee Goble (the "Jambys Officers"), including the enforcement of any personal guarantees and liens against the Jambys Officers.

2.      Specifically, the Jambys Officers are required to respond to a complaint filed by Velocity (defined below), a predatory lender, by **Monday, May 13, 2024**. The Jambys Officers cannot respond to the complaint because any response will require the Debtors' participation. Without an injunction extending the automatic stay to include the Jambys Officers, Velocity will likely pursue a default judgment. For the reasons explained herein and in the accompanying *Memorandum of Law in Support of the Debtors' Emergency Motion for an Order (I) Declaring that the Automatic Stay Applies to Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Pending a Final Hearing* (the "Stay Extension Brief"), the Debtors will need to participate in any action arising out of personal guarantees of the Jambys Officers and will suffer irreparable harm if they are forced to expend their limited resources and attention to the Velocity matter. Emergent injunctive relief is therefore necessary to protect the Debtors and their restructuring efforts.

3.      Jambys further seeks to have various MCA Agreements (defined below) declared void on the grounds that they are usurious and unconscionable in that they are loans disguised as purchase agreements with interest rates far exceeding the New York criminal maximum of 25%. Jambys is therefore entitled to a declaration that the MCA Agreements are void and unenforceable, and the return of all the principal, fees, and interest that Jambys paid on these loans. Alternatively, any amounts paid by Debtors under the Loan Agreements two years prior to the Petition Date, as well as ninety (90) days prior to the Petition Date must be returned to the Debtors' estate as avoidable transfers pursuant sections 547(b), 548(a)(1)(B) and 550 of the Bankruptcy Code.

4.      Between January and November 2023, Jambys purportedly entered into multiple agreements pursuant to which funding companies supposedly agreed to purchase revenue from Jambys, in exchange for a specified amount to be paid by Jambys to those funders over time (the "MCA Agreements").

5.      Under the MCA Agreements, Jambys is obligated to pay the funders a specified amount on a daily basis up to a final number, amounting to tens of thousands of dollars more than the original amount funded.

6.      On or about January 17, 2024, Jambys also entered into a loan agreement (the "SellersFi Agreement", and collectively with the MCA Agreements, the "Loan Agreements") with Defendant SellersFunding Corp. ("SellersFi").

7.      The Jambys Officers personally guaranteed Jambys's obligations under the Loan Agreements.

8.      In addition, Jambys's corporate bylaws and articles of incorporation require Jambys to indemnify the Jambys Officers to the extent they incur any liability "actually and reasonably incurred in connection with any proceeding" arising out of their capacities as directors, officers,

or agents of Jambys. Attached as **Exhibits A and B** hereto are true and correct copies of the Certification of Incorporation and Corporate Bylaws of Jambys, Inc., respectively. *See* Ex. A, Art. VI; Ex. B § 6.1.

9.    Although the MCA Agreements are titled as "revenue purchase agreements" or "future receipts sale and purchase agreements," many of them are loans claiming to be purchase agreements to avoid being subject to New York's criminal usury statute.

10.    With the exception of SellersFi, each of the Defendants herein are funders, brokers, and/or servicing agents of the MCA Agreements (all Defendants other than SellersFi, collectively, the "MCA Lenders"). They have either sued Jambys and the Jambys Officers for amounts allegedly due and owing under the MCA Agreements, have had liens issued against Jambys, and/or threatened suit or other coercive actions to collect amounts allegedly due by Jambys under the MCA Agreements (the "MCA Actions", and collectively with any efforts to enforce the SellersFi Agreement, the "Loan Actions").

11.    New York courts, however, have held that cash advances such are these are nothing more than loans that violate New York's criminal usury statute as well as the Racketeer Influenced and Corruption Organization Act. *See, e.g., Crystal Springs Cap., Inc. v. Big Thicket Coin,* LKC, 220 A.D.3d 745, 747 (2d Dep't 2023); *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC,* 2023 WL 3882697 (2d Cir. June 8, 2023).

12.    Indeed, the Attorney General for the State of New York recently filed suit against many revenue funders (including some of the MCA Lenders subject to this Complaint), alleging that they are guilty of criminal usury and fraud, and seeking, among other things, rescission of the agreements and restitution and damages to paid to all merchants. *See People v. Yellowstone Cap. LLC*, Index No. 450750/2024, Doc. No. 1 (N.Y. Sup. Ct. New York Cnty. March 5, 2024) (the

"NYAG Complaint").[3]  The MCA Agreements here are similar, and thus, the Court should deem the MCA Agreements, including the guarantees, unconscionable and void.

13.     In addition to an order declaring the MCA Agreements void, Jambys also seeks a temporary restraining order and preliminary injunction against all of the Loan Actions to avoid irreparable harm to its estate and the prospect of a successful reorganization that would occur if the Loan Actions were allowed to continue unabated.  The theories of liability asserted against the Jambys Officers are the same as the theories asserted against Jambys because the Jambys Officers are sued as alleged guarantors of the Loan Agreements. Because Jambys shares an identity of interest with the Jambys Officers and has an obligation to indemnify them for the guarantees they provided for the Debtors' financing, a uniform stay of all Loan Actions is necessary to avoid irreparable harm to Jambys's restructuring efforts.

14.     Absent a stay, Jambys's restructuring efforts will be hindered by its necessary involvement in the Loan Actions, the threat of collateral estoppel or evidentiary prejudice, and the depletion of estate assets. Jambys would be required to participate in discovery, devote time preparing for and participating in depositions, and help analyze and develop the Jambys Officers' legal defenses to protect Jambys's interests.

15.     Moreover, if the Loan Actions are not stayed, Jambys risks significant prejudice arising from contractual indemnification provisions providing that Jambys and the Jambys Officers must indemnify the funders of the MCA Agreements for any legal fees and expenses they incur as a result of monies owed to them by Jambys. And of course, Jambys risks potential collateral estoppel and evidentiary prejudice based on any factual or legal findings made against the Jambys Officers. Avoiding such harms will require Jambys's direct and substantial involvement in the

---

[3] A copy of the NYAG Complaint is available on the New York Attorney General website:
https://ag.ny.gov/sites/default/files/2024-03/nyag-v-yellowstone-et-al.pdf

litigation, drain Jambys's resources, prejudice other stakeholders, and divert time and attention away from maximizing value for the benefit of all stakeholders through implementing a strategic chapter 11 transaction.

16.     Defendants will not be materially prejudiced by an order staying or enjoining the Loan Actions.  Defendants face no imminent risk of harm or loss that would arise from the Loan Actions being stayed against the Jambys Officers. This is especially true in light of the significant likelihood that Jambys will be successful in demonstrating that the MCA Agreements are unconscionable and void as they are usurious loan agreements prohibited by New York law.

17.     The equities and the interests of justice weigh in favor of staying the Loan Actions, and the Court should grant the requested injunctive relief.

## JURISDICTION AND VENUE

18.     This adversary proceeding arises in and relates to Jambys's cases pending before this Court under chapter 11 of the Bankruptcy Code.

19.     The Court has jurisdiction to consider this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. The Court has subject matter jurisdiction over the claims against the Jambys Officers pursuant to 28 U.S.C. §§ 157 and 1334. Related-to jurisdiction exists over the claims against the non-debtor Jambys Officers because (1) Jambys and the Jambys Officers share an identity of interest, based upon their shared and common purpose and Jambys' lead role in defending and resolving the MCA Actions, such that the claims against the Jambys Officers are, in effect, claims against Jambys's estate; (2) the claims against the Jambys Officers raise factual and legal questions that are substantially identical to, and inextricably intertwined with, those raised by the claims against Jambys; and (3) continued

prosecution of claims against the Jambys Officers will have an adverse impact on Jambys's ability to reorganize.

20.     This is a core proceeding under 28 U.S.C. § 157(b), and Jambys confirms its consent, pursuant to Local Rule 9013-1(f), to the entry of a final order or judgment by the Court in connection with this adversary proceeding if it is determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

21.     Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

22.     Jambys is a Delaware corporation operating out of New York that sells loungewear and sleepwear through its own ecommerce site (Jambys.com), certain online retailers, and select wholesale partners. Jambys's mission is to make comfortable apparel from premium fabrics to help consumers maximize their relaxation at home.

23.     Upon information and belief, Velocity Capital Group ("Velocity") is a New York limited liability company, with an office in Cedarhurst, New York. By agreement dated August 9, 2023 (the "Velocity Agreement"), Velocity agreed to provide Jambys with $95,000.00 in funding in exchange for payments amounting to at least $134,900.00, resulting in an annualized interest rate of at least **81.91%**. Attached as **Exhibit C** hereto is a true and correct copy of the Velocity Agreement. The Velocity Agreement is governed by New York law. *See* Ex. C § 4.5.

24.     Upon information and belief, United First, LLC ("United First") is a New York limited liability company, with an office in Miami, Florida. By agreement dated August 24, 2023 (the "United First Agreement"), United First agreed to provide Jambys with $362,000.00 in funding in exchange for payments amounting to at least $507,043.00, resulting in an annualized

interest rate of at least **55.11%**. Attached as __Exhibit D__ hereto is a true and correct copy of the United First Agreement. The United First Agreement is governed by New York law. *See* Ex. D § 21.

25.     Upon information and belief, Global Funding Experts, LLC ("__GFE__") is a New York limited liability company, with an office in Queens, New York. GFE is the servicing agent for the United First Agreement.

26.     Upon information and belief, CloudFund LLC ("__CloudFund__") is a New York limited liability company, with an office located in Suffern, New York. CloudFund agreed to provide funding to Jambys on at least three separate occasions.

    a.     By agreement dated January 1, 2023 (the "__January CloudFund Agreement__"), CloudFund agreed to provide Jambys with $150,000.00 in funding in exchange for payments amounting to at least $224,850.00, resulting in an annualized interest rate of at least **89.96%**. Attached as __Exhibit E__ hereto is a true and correct copy of the January CloudFund Agreement.

    b.     By agreement dated July 6, 2023 (the "__July CloudFund Agreement__"), CloudFund agreed to provide Jambys with $260,000.00 in funding in exchange for payments amounting to at least $363,740.00, resulting in an annualized interest rate of at least **62.64%**. Attached as __Exhibit F__ hereto is a true and correct copy of the July CloudFund Agreement.

    c.     By agreement dated November 20, 2023 (the "__November CloudFund Agreement__", and collectively with the January CloudFund Agreement and July CloudFund Agreement, the "__CloudFund Agreements__"), CloudFund agreed to provide Jambys $345,600.00 in funding in exchange for payments amounting to at least $500,400.00, resulting in an annualized

interest rate of at least **74.34%**. Attached as **<u>Exhibit G</u>** hereto is a true and correct copy of the November CloudFund Agreement.

        d.      The CloudFund Agreements are governed by New York law.  *See* Exs. E, F, G § 38.

27.    Delta Bridge Funding, LLC ("<u>Delta Bridge</u>"), is the current servicing agent for the CloudFund Agreement, and upon information and belief, is the same entity as CloudFund. Upon information and belief, CloudFund is simply a "brand name", "platform", or shell affiliate for Delta Bridge's MCAs, created for the purpose of being named in the contracts for Delta Bridge's MCAs.

28.    Upon information and belief, Max Recovery Group LLC ("<u>Max Recovery Group</u>") is a New York limited liability company and is owned by the same owner(s) as Delta Bridge and CloudFund. Max Recovery Group was the servicing agent for the CloudFund Agreement until or about March 19, 2024.

29.    Upon information and belief, MCA Servicing Company ("<u>MCA Servicing</u>") is a New York limited liability company, with an office in Pomona, New York. MCA Servicing agreed to provide Jambys with funding on at least two separate occasions.

        a.      By agreement dated August 24, 2023 (the "<u>August MCA Servicing Agreement</u>"), MCA Servicing agreed to provide Jambys $125,000.00 in funding in exchange for payments amounting to at least $181,250.00, resulting in an annualized interest rate of at least **112.98%**. Attached as **<u>Exhibit H</u>** hereto is a true and correct copy of the August MCA Servicing Agreement.

        b.      By agreement dated October 5, 2023 (the "<u>October MCA Servicing Agreement</u>", and collectively with the August MCA Servicing Agreement, the "<u>MCA Servicing</u>

Agreements"), MCA Servicing agreed to provide Jambys another $70,000.00 in funding in exchange for payments amounting to at least $104,300.00, resulting in an annualized interest rate of at least **138.83%**. Attached as **<u>Exhibit I</u>** hereto is a true and correct copy of the October MCA Servicing Agreement.

        c.      The MCA Agreements are governed by New York law.  *See* Exs. H and I, § 4.5.

    30.    Upon information and belief, NewCo Capital Groups VI LLC ("<u>New Co</u>") is a New York limited liability company, with an office in Monsey, NY.  By agreement dated January 26, 2023 (the "<u>NewCo Agreement</u>"), NewCo agreed to provide Jambys with $100,000.00 in funding in exchange for payments amounting to at least $142,000.00, resulting in an annualized interest rate of at least **87.90%**. Attached as **<u>Exhibit J</u>** hereto is a true and correct copy of the NewCo Agreement.  The NewCo Agreement is governed by New York law.  *See* Ex. J, § 4.5.

    31.    Upon information and belief, Simmons Capital Partners ("<u>Simmons</u>") is an entity authorized to do business in New York, with an office at 1545 Route 202, Suite 203, Pomona NY 10970.

    32.    Also upon information and belief, Simmons, MCA Servicing, and NewCo are either the same entity or corporate alter egos. Simmons brokered the MCA Agreements between Jambys and United First, CloudFund, MCA Servicing, and NewCo. However, unlike the United First, CloudFund, and MCA Servicing Agreements, which each bear the letterhead of each respective MCA Lender, the NewCo Agreement suspiciously bears the letterhead of Simmons throughout the form, and furthermore was structured with nearly identical format and wording to the MCA Servicing Agreements.

33.     Upon information and belief, SellersFi is a Delaware corporation, with an office in Weston, Florida.  By agreement dated January 17, 2024, (the "SellersFi Agreement"), SellersFi provided $250,000 in funding to Jambys in exchange for a Note executed by Jambys providing for 21% interest per annum, to be repaid over thirty-six (36) bi-weekly terms.  Attached as **Exhibit K** hereto is a true and correct copy of the SellersFi Agreement.

## FACTUAL BACKGROUND

**I.     The MCA Agreements**

**A.     The Velocity Agreement**

34.     On or about August 9, 2023, Jambys signed the Velocity Agreement which is entitled "Revenue Purchase Agreement." Velocity's signature, however, does not appear anywhere in the Velocity Agreement. *See generally* Ex. C.

35.     Pursuant to the Velocity Agreement, Velocity agreed to provide Jambys with $95,000.00 in funds. *Id.* at p.1.

36.     In exchange, Jambys purportedly agreed to sell to Velocity, a percentage of all of Jambys's "future accounts, contract rights and other entitlements arising from or relating to the payment of monies from [Jambys's] customer's [sic] and/or other third party payors" until the "Purchased Amount" identified in the Velocity Agreement is paid in full. *Id.* The Velocity Agreement identifies the "Purchased Amount" as $134,900.00. *Id.* According to the Velocity Agreement, the Purchased Amount would be debited by Velocity from Jambys's designated bank account in daily increments of $999 per business day. *Id.*

37.     The Velocity Agreement expressly states that Jambys "is selling a portion of a future revenue stream to [Velocity] at a discount, not borrowing money from [Velocity], therefore there is no interest rate or repayment schedule . . . ." Despite this, it is clear the Velocity Agreement

11

is structured as a loan in that it provides Jambys with funding in exchange for payments resulting in a repayment amount (*i.e.,* principal plus interest), higher than the amount funded (*i.e.,* principal). *Id.*

38.    The daily increments debited by Velocity are defined in the Velocity Agreement as the daily "Remittance," which the Velocity Agreement claims is a "good faith estimate" of 20% of the "daily average revenues" of Jambys during the previous calendar month divided by the number of business days in the calendar month. *Id.*

39.    Although the Velocity Agreement claims that the daily Remittance is based on the percentage of revenue collected by Jambys, the Remittance is completely disconnected from any fluctuations in Jambys's revenue. The Remittance amount is not altered simply because Jambys's revenue changes and is in fact completely up to Velocity's sole discretion.

40.    The Velocity Agreement purports to provide a mechanism for adjusting the Remittance amount. *See id.* § 1.4. However, it is impossible to utilize it. For example, it only allows reconciliation of the remittance if the request is made by Jambys specifically two weeks after the Velocity provides the agreed-upon funding and only if the amount debited by Velocity was more than 20% of Jambys's total revenue since the date of the Velocity Agreement. Furthermore, no adjustment is permitted if there is an Event of Default, which includes having insufficient funds in the designated account, any interruptions to the daily debits, any changes with the bank or designated account that Velocity considers adverse or unacceptable, and a slew of other items. *Id.* In other words, if Jambys does not have enough funds in its account to cover the daily Remittance, it is not permitted to seek an adjustment to that daily Remittance. Thus, the Velocity Agreement renders it virtually impossible to obtain a change in the daily remittance even with an actual change

in revenue, despite being characterized as a "revenue purchase agreement." In reality, the Velocity Agreement is a usurious loan cloaked as a purchase of revenue.

41.    The dollar amount of interest earned by Velocity pursuant to the Velocity Agreement may be determined by calculating the difference between the "Purchased Amount" of $134,900.00 to be paid back by Jambys and the "Purchase Price" of $95,000.00, which is the amount funded by Velocity. That amount of interest is $39,900 over the Velocity Agreement term of approximately 138 daily Remittances.

42.    Utilizing the New York Attorney General's interest calculation formula of **(A/P)/(T/M)**,[4] the annual interest rate of the Velocity Agreement is *at least* **81.91%**, more than triple the maximum of 25% permitted by New York's criminal usury statute.[5]

43.    The Velocity Agreement is designed to ensure that Velocity will be repaid in full – no matter what changes occur in Jambys's revenue stream – by including personal guarantees executed by the Jambys Officers. *See* Ex. C at p.6. The Velocity Agreement provides that upon any Event of Default, Velocity may seek immediate payment of all amounts due by Jambys from the Jambys Officers, including, but not limited to, all losses and damages incurred by Velocity in enforcing the Velocity Agreement. *Id.* This includes all expenses and attorneys' fees incurred by Velocity resulting from any claims for monies allegedly owed it by Jambys. *Id.* § 3.4.

44.    The Velocity Agreement also ensures that Velocity will be paid by purportedly granting Velocity with a security interest, under the Uniform Commercial Code, in all of Jambys's

---

[4] Here, **"A"** represents the amount of interest, **"P"** represents the principal amount (or "Purchased Amount" here), **"T"** represents the number of days in the term, and **"M"** represents the number of business days in a year. *See* NYAG Complaint ¶ 462; *see also People v. Richmond Cap. Grp. LLC*, 80 Misc.3d 1213(A), at *10, 195 N.Y.S.3d 637 (N.Y. Sup. Ct. 2023) (adopting NYAG formula for purposes of calculating usurious interest rates from MCA lender defendants). The New York Attorney General assumes 251 business days in a year under this analysis. *Id.*

[5] Moreover, as with all of the other MCA Agreements, when the interest rate is calculated using the amount *received* by Jambys net of the various "fees" applied by each of the MCA lenders, the interest rate becomes even greater and more usurious.

assets, including, but not limited to, "all accounts, chatter, documents, equipment, general intangibles, instruments and inventory," "all proceeds," "all funds at any time in [Jambys' or Jambys Officers'] accounts," "present and future electronic check transactions," and "any amount which may be due to Velocity under the [Velocity Agreement]." *Id.* at p.5.

45.    As noted above, Jambys, Inc. is a Delaware corporation.  Under sections 9-301 and 9-307(e) of Delaware's enacted Uniform Commercial Code, a creditor is required to file a UCC-1 financing statement in the company's state of incorporation, which for Jambys, Inc. is Delaware. *See* DEL. CODE. ANN. tit. 6, §§ 9-301; 9-307(e). Attached hereto as **Exhibit L** is a true and correct copy of lien searches run through the Delaware Secretary of State on April 15, 2024.  As shown herein, Velocity did *not* file a UCC-1 financing statement and is thus unsecured. Rather, Velocity filed a UCC-1 financing statement in Texas, which is wholly ineffective against the Debtors. Attached hereto as **Exhibit M** is a true and correct copy of Velocity's UCC-1 financing statement filed in Texas.

46.    Upon Jambys's execution of the Velocity Agreement in August 2023, Velocity provided Jambys with approximately $91,985.00 in funding (after accounting for fees) and began debiting Jambys's bank account at $999 per business day towards the $134,900.00 due to Velocity, under the Velocity Agreement.

47.    In early 2024, Jambys did not have sufficient funds in the designated account, resulting in bounced debits. The parties thereafter negotiated a payment plan and Jambys began making payments.

48.    On March 7, 2024, Jambys informed Velocity that it would not make any additional payments in light of the fact that Velocity Capital Group is named as a defendant in the New York

Attorney General's Complaint and the Velocity Agreement is a usurious loan prohibited by New York law.

49.     On the same day, Velocity responded claiming that the "Velocity Capital Group" identified in the New York Attorney General's Complaint is a different entity and threatened legal action. *See* NYAG Complaint ¶ 57 (naming "Velocity Capital Group" as a DBA entity name/alter ego of World Global Capital LLC, a New York subsidiary of Yellowstone Capital LLC).

50.     However, a New York Department of State corporate search reveals that no other New York corporate entities exist under the name Velocity Capital Group other than Defendant Velocity.

51.     As of March 12, 2024, Jambys had paid approximately $120,930.00 to Velocity under the Velocity Agreement.

52.     On March 22, 2024, Velocity filed a Complaint (the "Velocity Action") in the Supreme Court of the State of New York, Kings County, against Jambys and the Jambys Officers, seeking to recover $28,184.00 plus attorneys' fees and expenses under the Velocity Agreement and Guaranty. The deadline for the Jambys Officers to file an answer in the Velocity Action is May 13, 2024.

53.     On April 22, 2024, Jambys received notice from Amazon.com's counsel that there was a hold on any disbursement of the funds contained in Jambys's account as a result of, *inter alia*, a purported UCC-1 lien asserted by Velocity.  As noted above, the UCC-1 financing statement was filed in Texas, and Velocity had no basis in fact or law to assert a lien on the Debtors' assets held by Amazon.  On or around May 7, 2024, or one week after the Petition Date, Jambys was able to secure a release of the hold on its Amazon account by demonstrating that Velocity had failed to properly perfect its security interest.

B.      **The United First Agreement**

54.     On or about August 24, 2023, Jambys signed the United First Agreement which is entitled "Purchase and Sale of Future Receipts Agreement." United First's signature, however, does not appear anywhere in the United First Agreement.  *See generally* Ex. D.

55.     Pursuant to United First Agreement, United First agreed to provide Jambys with $362,000.00 in funds. *Id.* at p.2.

56.     In exchange, Jambys purportedly agreed to sell to United First, a percentage of all of Jambys's "future receipts," defined to include "all payments made by cash, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card, . . . or other form of monetary payment in the order course of [Jambys's] business" until the "Purchased Amount of Future Receipts" is paid in full. The United First Agreement – which is itself internally inconsistent – identifies that amount as $506,438.00, $506,998.00, or $507.043.00, depending on where one looks in the Agreement. *See id.* at Offer Summary; *id.* at p.2.  Without making any concessions or prejudice to its position, Jambys utilizes the lowest number, $506,438.00, for illustrative purposes of the calculations herein only.

57.     According to the United First Agreement, the Purchased Amount of Future Receipts would be debited by United First from Jambys's designated bank account in daily increments of $2,779.00 per business day. *Id.* at p.2 and § 1.

58.     The United First Agreement expressly states that Jambys "is selling a portion of a future revenue stream to [United First] at a discount, not borrowing money from [United First]." *Id.* § 3. Despite this, the United First Agreement acts as a loan in that it provides Jambys with funding in exchange for payments resulting in a repayment amount (*i.e.,* principal plus interest), higher than the amount funded (*i.e.,* principal).

59.     The daily increments debited by United First are defined in the United First Agreement as the "Periodic Amount," which the United First Agreement claims is "intended to represent" 11% of Jambys's "actual Future Receipts." *Id.* at p.2 and § 1.

60.     Although the United First Agreement claims that the Periodic Amount is based on the percentage of Jambys's actual receipts, the Periodic Amount is completely disconnected from any fluctuations in Jambys's revenue. The Periodic Amount is not altered simply because Jambys's revenue changes and is in fact completely up to United First's sole discretion.

61.     The dollar amount of interest earned by United First pursuant to the United First Agreement may be determined by calculating the difference between the "Purchased Amount of Future Receipts" of $506,438.00 plus fees to be paid back by Jambys and the "Purchase Price" of $362,000.00, which is the amount funded by United First. That amount of interest is $144,438.00, over the loan term of approximately 182 daily Remittances.

62.     Utilizing the New York Attorney General's interest calculation formula of **(A/P)/(T/M)**, the annual interest rate of the United First Agreement is *at least* **55.11%**, almost double the maximum of 25% permitted by New York's criminal usury statute.

63.     The United First Agreement is designed to ensure that United First will be repaid in full – no matter what changes occur in Jambys's revenue stream – by including personal guarantees executed by the Jambys Officers. Ex. D at p.3 and § 17. The United First Agreement provides that upon any Event of Default, United First may seek immediate payment of all amounts due by Jambys from both Jambys and the Jambys Officers, including, but not limited to, all of United First's costs in connection with Jambys's default. *Id.* § 14. This includes all reasonable expenses and attorneys' fees. *Id*. § 14.

64.    The United First Agreement also ensures that United First will be paid by purportedly granting United First with a security interest, under the Uniform Commercial Code, in all of "Future Receipts" in Jambys, as that term is defined in the United First Agreement. *Id.* § 12.

65.    As noted above, Jambys, Inc. is a Delaware corporation.  Under sections 9-301 and 9-307(e) of Delaware's enacted Uniform Commercial Code, a creditor is required to file a UCC-1 financing statement in the company's state of incorporation, which for Jambys, Inc. is Delaware. *See* DEL. CODE. ANN. tit. 6, §§ 9-301; 9-307(e). *See also* Ex. L (showing no Delaware UCC-1 filings by United First).  As United First failed to file a UCC-1 financing statement in the correct jurisdiction, it is thus unsecured. Upon information and belief, Velocity filed a UCC-1 financing statement in New York, which is wholly ineffective against the Debtors.

66.    Upon Jambys's execution of the United First Agreement in August 2023, United First began providing Jambys with funding in accordance with the United First Agreement, which required that the funding be provided in seventeen (17) increments minus any fees. *See id.* at p.16. United First also began debiting Jambys's bank account at $2,779.00 per business day, as set forth in the United First Agreement.

67.    The United First Agreement was serviced by GFE.

68.    In January 2024, Jambys did not have sufficient funds for the daily debits, and certain debits were returned due to insufficient funds.  Jambys informed GFE that it could no longer make the payments, and they negotiated a payment schedule pursuant to which Jambys made some delayed payments.

69.    In mid-February 2024, additional debits were returned due to insufficient funds.

70.     On March 7, 2024, GFE informed Jambys that it would be declaring a default and referring the matter to their legal department, which would result in a lawsuit being filed against Jambys. GFE also stated that it was in the process of filing a UCC lien against Jambys's business.

71.     On March 7, 2024, Jambys's counsel responded that would not make any additional payments in light of the fact that the United First Agreement is a usurious loan prohibited by New York law and contain terms substantially similar to the fundings agreements being challenged by the New York Attorney General. United First responded, disagreeing with Jambys's position.

72.     As of March 13, 2024, Jambys had paid approximately $273,228.00 to United First under the United First Agreement. United First, however, stopped providing Jambys with funding after the fourteenth (14) increment, despite the fact that the United First Agreement required United First to make seventeen (17) payments. United First's last funding payment to Jambys under the United First Agreement was on November 21, 2023, amounting to approximately $315,223.90 in total funding after accounting for fees.

73.     On April 22, 2024, Jambys received notice from Amazon.com's counsel that there was a hold on any disbursement of the funds contained in Jambys's account as a result of, *inter alia*, a purported UCC-1 lien asserted by United First.  As noted above, the UCC-1 financing statement was filed in New York, and United First had no basis in fact or law to assert a lien on the Debtors' assets held by Amazon.  On or around May 7, 2024, or one week after the Petition Date, Jambys was able to secure a release of the hold on its Amazon account by demonstrating that United First had failed to properly perfect its security interest.

C.     **The CloudFund Agreements**

74.     On or about January 27, 2023, Jambys signed the January CloudFund Agreement which is entitled "Future Receipts Sale and Purchase Agreement." *See generally* Ex. E.

19

75.    On or about July 6, 2023, Jambys signed the July CloudFund Agreement which is entitled "Future Receipts Sale and Purchase Agreement." *See generally* Ex. F.

76.    On or about November 20, 2023, Jambys signed the November CloudFund Agreement which is entitled "Future Receipts Sale and Purchase Agreement" *See generally* Ex. G.

77.    CloudFund's signature, however, does not appear anywhere in the CloudFund Agreements. *See generally* Exs. E, F, G.

78.    CloudFund agreed to provide Jambys with $150,000.00 in funds pursuant to the January CloudFund Agreement, $260,000.00 in funds pursuant to the July CloudFund Agreement, and $360,000.00 in funds under November CloudFund Agreement. *See* Exs. E, F, G at p.1.

79.    Each successive agreement was used to satisfy the immediately preceding loan, and further imposed additional "due diligence", "origination", and "UCC" fees. Thus, of the $150,000.00 to be provided by the January CloudFund Agreement, $7,576.00 was deducted to pay for fees, leaving a net amount of only $142,424.00 to be provided. Ex. E at p.1.

80.    Of the $260,000.00 to be provided under the July CloudFund Agreement, $53,660.00 was used to pay off the remaining balance of the previous loan and $13,000.00 was charged in new fees, leaving a net amount of only $193,340.00 to be provided. Ex. F at p.1.

81.    Similarly, of the $360,000.00 to be provided under the November CloudFund Agreement, $143,430.00 was used to satisfy the balance owed under the July CloudFund Agreement and $14,400.00 was charged in new fees, leaving only a net amount of $202,170.00 actually funded under the November CloudFund Agreement. Ex. G at p.1.

82.    Thus, CloudFund essentially consolidated the previous agreements into one superseding agreement, resulting in a total "funding amount" or "Purchase Price" of $360,000.00

under the November CloudFund Agreement. *Id.* However, though the total face value of the CloudFund Agreements' envisioned funding was $770,000.00, the amount actually provided to the Debtors was only <u>$537,934.00</u>, after accounting for the double-dipped fees and previous balance consolidations.

83.     In exchange, Jambys purportedly agreed to sell to CloudFund, a percentage of all of Jambys's "future receipts," defined to include "all of [Jambys's] receipts for the sale of good and services . . . which payments or deliveries of monies can be made in the form of cash, check, credit, charge or debit card, Automated Clearing House ("<u>ACH</u>") or other electronic transfer or any form of monetary payment and/or pecuniary benefit received from [Jambys]" until the "Purchased Amount" is paid in full. Exs. E, F, G §§ 1(c), 2, 3. The January CloudFund Agreement identifies the "Purchased Amount" as $224,850.00, the July CloudFund Agreement identifies the "Purchased Amount" as $363,740.00, and the November CloudFund Agreement identifies the "Purchased Amount" as $500,400.00. *Id.* at p.1.

84.     According to the CloudFund Agreements, the Purchased Amount would be debited by CloudFund from Jambys's designated bank account in daily increments per business day. The CloudFund Agreements refer to the daily debits as the "Remittance Amount."

85.     The January CloudFund Agreement states that the "Remittance Amount" is "a good faith approximation of" 5% of Jambys's "Future Receipts," resulting in debits of $1,615.00 per business day. Ex. E, p. 1 and § 1(i).

86.     The July CloudFund Agreement states that the "Remittance Amount" is "a good faith approximation of" 8% of Jambys's "Future Receipts," resulting in debits of $2,275.00 per business day. Ex. F, p. 1 and § 1(i).

87.     The November CloudFund Agreement states that the "Remittance Amount" is "a good faith approximation of" 13% of Jambys's "Future Receipts," resulting in debits of $3,800.00 per business day. Ex. G, p. 1 and § 1(i).

88.     The CloudFund Agreements expressly state that Jambys "is selling a portion of a future revenue stream to [CloudFund] at a discount, not borrowing money from [CloudFund]." Exs. E, F, G § 14(a). Despite this, the CloudFund Agreements act as loans in that they provide Jambys with funding in exchange for payments resulting in a repayment amount (*i.e.*, principal plus interest), higher than the amount funded (*i.e.*, principal).

89.     Although the CloudFund Agreements claim that the Remittance Amount is based on the percentage of revenue collected by Jambys, the Remittance Amount is completely disconnected from any fluctuations in Jambys's revenue. The Remittance Amount is not altered simply because Jambys's revenue changes and is in fact completely up to CloudFund's sole discretion.

90.     The CloudFund Agreements purport to provide a mechanism for adjusting the daily Remittance Amount. *See id.* §§ 12, 13. However, it is impossible to utilize it because it only allows adjustment if no Event of Default has occurred, which includes multiple rejected debits made on the designated account, any changes to the account information, the violation of any provision at all in the CloudFund Agreements, and a slew of other items. *Id.* §§ 12(a), 25. Similarly, the CloudFund Agreements also purport to allow reconciliation of the Remittance Amount, but only in the absence of a default. *See id.* §§ 10, 11. In other words, if Jambys does not have enough funds in its account to cover the daily Remittance Amount, it is not permitted to seek an adjustment to or reconciliation of the daily Remittance Amount. Thus, the CloudFund Agreements render it virtually impossible to obtain a change in the daily remittance even with an actual change in

revenue, despite being characterized as a "future receipts sale and purchase agreement." In reality, the CloudFund Agreements are usurious loans cloaked as a purchase of revenue.

91.     The dollar amount of interest earned by CloudFund pursuant to the CloudFund Agreement may be determined by calculating the difference between the "Purchased Amount" and the "Purchase Price" and then dividing that number by the Purchase Price.

92.     Under the January CloudFund Agreement, the dollar amount of interest earned by CloudFund in dollars is $74,850 ($224,850.00 minus $150,000.00) over the loan term of approximately 139 daily Remittances.

93.     Utilizing the New York Attorney General's interest calculation formula of (A/P)/(T/M), the annual interest rate of the January CloudFund Agreement is *at least* **89.96**%. That is more than triple the maximum of 25% permitted by New York's criminal usury statute.

94.     Under the July CloudFund Agreement, the dollar amount of interest earned by CloudFund in dollars is $103,740.00 ($363,740.00 minus $260,000.00) over the loan term of approximately 160 daily Remittances.

95.     Utilizing the New York Attorney General's interest calculation formula of (A/P)/(T/M), the annual interest rate of the July CloudFund Agreement is *at least* **62.64%**. That is more than double the maximum of 25% permitted by New York's criminal usury statute.[6]

96.     Under the November CloudFund Agreement, the dollar amount of interest earned by CloudFund in dollars is $140,400.00 ($500,400.00 minus $360,000.00) over the loan term of approximately 132 daily Remittances.

---

[6] When factoring in the additional "fees" for each CloudFund Agreement (which appear to be calculated as a set percentage of the loan principal), the interest rate calculations grow even larger and more usurious. Moreover, considering that each subsequent CloudFund Agreement consolidated the remaining unpaid principal of the preceding loan, it is clear that CloudFund was doubledipping with these fee calculations.

97.     Utilizing the New York Attorney General's interest calculation formula of **(A/P)/(T/M)**, the annual interest rate of the November CloudFund Agreement is *at least* **74.34%**. That is nearly triple the maximum of 25% permitted by New York's criminal usury statute.

98.     The CloudFund Agreements are designed to ensure that CloudFund will be repaid in full – no matter what changes occur in Jambys's revenue – by purporting to include personal guarantees executed by the Jambys Officers. *See* Exs. E, F, G § 20. The CloudFund Agreements provide that upon any Event of Default, CloudFund may seek immediate payment of all amounts due by Jambys from both Jambys and the Jambys Officers, including, but not limited to, all of CloudFund's costs in connection with Jambys's default. This includes all reasonable expenses and attorneys' fees.

99.     The CloudFund Agreements also ensure that CloudFund will be paid by purportedly granting CloudFund with a security interest, under the Uniform Commercial Code, in all of "Future Receipts" in Jambys, as that term is defined in the CloudFund Agreements. *Id.* § 20.

100.    As noted above, Jambys, Inc. is a Delaware corporation. Under sections 9-301 and 9-307(e) of Delaware's enacted Uniform Commercial Code, a creditor is required to file a UCC-1 financing statement in the company's state of incorporation, which for Jambys, Inc. is Delaware. *See* DEL. CODE. ANN. tit. 6, §§ 9-301; 9-307(e). *See also* Ex. L (showing no Delaware UCC-1 filings by CloudFund). As CloudFund failed to file a UCC-1 financing statement in the correct jurisdiction, it is thus unsecured. Upon information and belief, CloudFund filed a UCC-1 financing statement in New York, which is wholly ineffective against the Debtors.

101.    Upon Jambys's execution of the January CloudFund Agreement, CloudFund provided Jambys with $142,424.00 in additional funding and began debiting Jambys's bank account at $1,615.00 per business day, as set forth in the January CloudFund Agreement.

102.   When Jambys required additional funding later in the year, CloudFund agreed to consolidate the remaining balance under the July CloudFund Agreement.

103.   Upon Jambys's execution of the July CloudFund Agreement, CloudFund provided Jambys with $193,340.00 in additional funding and began debiting Jambys's bank account at $2,275.00 per business day, as set forth in the July CloudFund Agreement.

104.   When Jambys again required additional funding, CloudFund again agreed to consolidate the remaining balance under the November CloudFund Agreement.

105.   Upon Jambys's execution of the November CloudFund Agreement, CloudFund provided Jambys with $202,170.00 in additional funding and began debiting Jambys's bank account at $3,600.00 per business day, as set forth in the November CloudFund Agreement.

106.   In early 2024, Jambys informed CloudFund that it did not have sufficient funds for the daily debits, and CloudFund and Jambys negotiated a payment schedule that allowed for some delayed payments. Jambys later missed additional payments due to a significant reduction in revenue.

107.   On March 19, 2024, Jambys received an email from CloudFund customer service, informing Jambys that Delta Bridge will be servicing the November CloudFund Agreement going forward.  Prior to that, the loans had been serviced by Max Recovery Group.

108.   Upon information and belief, Max Recovery Group is owned by the owner and co-founder of Delta Bridge. Upon information and belief, CloudFund is the same entity as Delta Bridge, which is a subject of the New York Attorney General's investigation into similar funding agreements and a defendant named in the NYAG Complaint alleging that these funding agreements are usurious loans prohibited by New York law. *See* NYAG Complaint.

109.    On or around March 13, 2024, attorneys for CloudFund notified Amazon.com and Stripe, Inc. that it had filed a UCC-1 financing statement with the Secretary of State with respect to amounts owed by Jambys under the CloudFund Agreements. This was a problem for Jambys because much of Jambys's revenue comes from these entities. Jambys reached out to CloudFund and agreed to make a payment.

110.    On March 25, 2024, after receiving a payment, CloudFund's counsel notified Amazon.com and Stripe, Inc., that it could release all funds restrained by the lien.

111.    Thereafter, CloudFund's counsel demanded that Jambys sign an agreement, with a new payment plan, indicating that Jambys would not contest the validity of the CloudFund Agreements. Jambys did not sign the agreement.

112.    On April 11, 2024, upon information and belief, CloudFund's counsel again notified Amazon.com and Stripe, Inc., that it had a lien on all funds payable to Jambys pursuant to § 9-406(a) of the Uniform Commercial Code.

113.    On April 22, 2024, Jambys received notice from Amazon.com's counsel that there was a hold on any disbursement of the funds contained in Jambys's account as a result of, *inter alia*, a purported UCC-1 lien asserted by CloudFund.  As noted above, the UCC-1 financing statement was filed in New York, and CloudFund had no basis in fact or law to assert a lien on the Debtors' assets held by Amazon.  On or around May 7, 2024, or one week after the Petition Date, Jambys was able to secure a release of the hold on its Amazon account by demonstrating that CloudFund had failed to properly perfect its security interest.

114.    To date, Jambys's records show it has paid approximately a total of $552,079.00 to CloudFund, against CloudFund's total "face value" initial funding of $770,000; total "actual funding"[7] of $537,934.00; and a total repayment obligation[8] of $894,679.00.

### D.    The MCA Servicing Agreements

115.    On or about August 24, 2023, Jambys signed the August MCA Servicing Agreement which is entitled "Revenue Purchase Agreement." *See generally* Ex. H.

116.    Similarly, on or about October 5, 2023, Jambys signed the MCA Servicing Agreement which is entitled "Revenue Purchase Agreement." *See generally* Ex. I.

117.    As detailed above, upon information and belief, MCA Servicing Company and Simmons Capital Partners, which brokered the MCA Servicing Agreements, are either the same entity or corporate alter egos.

118.    Neither Simmons's nor MCA Servicing's signature, however, appear anywhere in the MCA Servicing Agreements. *See generally* Exs. H and I.

119.    MCA Servicing agreed to provide Jambys with $125,000.00 in funds pursuant to the August MCA Servicing Agreement and $70,000.00 in funds pursuant to the October MCA Servicing Agreement. Exs. H and I, at p.1.

120.    In exchange, Jambys purportedly agreed to sell to MCA Servicing, a percentage of all of Jambys's "payments, receipts, settlements and funds paid to or received" by Jambys "in payment or settlement of [Jambys's] existing and future accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from [Jambys's] customers and/or payors or obligors" until the

---

[7]    Calculated as "Face Value", net of lender fees and previously consolidated loan balances.

[8]    Calculated as the total "Purchased Amounts" of the CloudFund Agreements, net of remaining balances from January and July CloudFund Agreements.

"Purchased Amount" identified in each of the MCA Servicing Agreements is paid in full. *Id.* The August MCA Servicing Agreement identifies the "Purchased Amount" as $181,250.00 and the October MCA Servicing Agreement identifies the "Purchased Amount" as $104,300.00. *Id.*

121.    According to the MCA Servicing Agreements, the Purchased Amount would be debited by MCA Servicing from Jambys's designated account in daily increments per business day and MCA Servicing may collect twice the amount on any date following a United States banking holiday. *Id.* The daily increments debited by MCA Servicing are defined in the MCA Servicing Agreement as the daily "Remittance," which the MCA Servicing Agreements claim is a "good faith estimate" of "MCA's share of future revenue stream." *Id.*

122.    The Remittance under the August MCA Servicing Agreement is identified as $1,813.00. Ex. H at p.1. The Remittance under the October MCA Servicing Agreement is identified as $1,043.00. Ex. I at p.1.

123.    The MCA Servicing Agreements expressly state that Jambys "is selling a portion of a future revenue stream to MCA at a discount, and is not borrowing money from MCA, therefore there is no interest rate or payment schedule and no time by which the Purchased Amount must be collected by MCA." Exs. H and I, at p.1. Despite this, the MCA Servicing Agreements behaved as loans in that they provided Jambys with funding in exchange for payments resulting in a repayment amount (*i.e.,* principal plus interest), higher than the amount funded (*i.e.,* principal).

124.    Although the MCA Servicing Agreements claim that the daily Remittance is based on Jambys's future revenue stream, the Remittance is completely disconnected from any fluctuations in Jambys's revenue. The Remittance amount is not altered simply because Jambys's revenue changes and is in fact completely up to MCA Servicing's sole discretion.

125.     The MCA Servicing Agreements purport to provide a mechanism for adjusting the amount of the Remittance. *See id.* §1.4. However, it is impossible to utilize it because it only allows adjustment if no Event of Default has occurred, which includes not having sufficient funds in the designated account, any notification by Jambys that it intends to breach the agreements by not making the daily debits or otherwise, changes being made to the designated account's login information, the maintenance of other bank accounts without MCA Servicing's consent, and a slew of other items. *Id.* §§ 1.4, 3.1.

126.     Similarly, the MCA Servicing Agreements also purport to allow for reconciliation of the Remittance, but only in the absence of a default. *Id*. § 1.3. In other words, if Jambys does not have enough funds in its account to cover the daily Remittance, it is not permitted to seek an adjustment or reconciliation to the daily Remittance. Thus, the MCA Servicing Agreements render it virtually impossible to obtain a change in the daily remittance even with an actual change in revenue, despite being characterized as a "revenue purchase agreement." In reality, the MCA Servicing Agreement are usurious loans, cloaked as a purchase of revenue.

127.     The dollar amount of interest earned by MCA Servicing pursuant to the MCA Servicing Agreements may be determined by calculating the difference between the "Purchased Amount" and the "Purchase Price" and then dividing that number by the "Purchase Price."

128.     Under the August MCA Servicing Agreement, the dollar amount of interest earned by MCA Servicing in dollars is $56,250 ($181,250.00 minus $125,000.00) over the loan term of approximately 100 daily Remittances.

129.     Utilizing the New York Attorney General's interest calculation formula of **(A/P)/(T/M)**, the annual interest rate of the August MCA Servicing Agreement is *at least*

**112.98%**. That is more than four times the maximum of 25% permitted by New York's criminal usury statute.

130.    Under the October MCA Servicing Agreement, the dollar amount of interest earned by MCA Servicing in dollars is $34,300 ($104,300.00 minus $70,000) over the loan term of approximately 107 daily Remittances.

131.    Utilizing the New York Attorney General's interest calculation formula of **(A/P)/(T/M)**, the annual interest rate of the October MCA Servicing Agreement is *at least* **138.83**%. That is more than five times the maximum of 25% permitted by New York's criminal usury statute.

132.    The MCA Servicing Agreements are designed to ensure that MCA Servicing will be repaid in full – no matter what changes occur in Jambys's revenue – by including personal guarantees executed by the Jambys Officers. *See* Exs. H and I at p.6 and § 3.2. The MCA Servicing Agreements provide that upon any Event of Default, MCA Servicing may seek immediate payment of all amounts due by Jambys from the Jambys Officers, including, but not limited to, all losses and damages incurred by MCA Servicing in enforcing the MCA Servicing Agreements. *Id.* This includes all expenses and attorneys' fees incurred by MCA Servicing in connection with the enforcement of the MCA Servicing Agreements. *Id.*

133.    The MCA Servicing Agreements also ensure that MCA Servicing will be paid by purportedly granting MCA Servicing with a security interest, under the Uniform Commercial Code, in all of Jambys's assets, including, but not limited to, "all accounts, chatter, documents, equipment, general intangibles, instruments and inventory," "all proceeds," "all funds at any time in [Jambys' or Jambys Officers'] accounts," "present and future electronic check transactions," and "any amount which may be due to MCA under the [MCA Servicing Agreements]." *Id.* at p.5.

134.    Upon Jambys's execution of the August and October MCA Servicing Agreements, MCA Servicing provided Jambys with $117,450.00 and $62,950.00 in respective funding (after accounting for fees) and began debiting Jambys's bank account in accordance with the MCA Servicing Agreements.

135.    To date, Jambys's records indicate it has paid a total of $275,203.00 toward the MCA Servicing Agreements.

136.    The MCA Servicing Agreements provided a total of $195,000.00 in face value principal funding (*i.e.*, before deduction of fees), and required a total repayment obligation of $285,550.00.

137.    On April 25, 2024, MCA Servicing filed a Complaint (the "MCA Servicing Action") in the Supreme Court of the State of New York, Kings County, against Jambys and the Jambys Officers seeking to recover a total of $17,940.10 under the October MCA Servicing Agreement and related Guaranty. According to MCA Servicing's Complaint, there is a $10,927.00 receivable due under the October MCA Servicing Agreement, plus MCA Servicing is seeking $735.00 in "NSF fees," $3,000 in default fees, plus $3,278.10. in attorneys' fees.

138.    As of the date of filing, the MCA Servicing Action has not been served.

**E.    NewCo Agreement**

139.    Simmons, which brokered the United First Agreement, the CloudFund Agreements, and the MCA Servicing Agreements, also brokered the NewCo Agreement entitled "Revenue Purchase Agreement" dated January 26, 2023. *See generally* Ex. J.

140.    While the lender identified in the NewCo Agreement is NewCo, the agreement is emblazoned with the Simmons letterhead on every page. *Id.* This is in stark contrast to the other MCA Agreements brokered by Simmons, which each utilized the letterheads of each respective

lender. Moreover, apart from the numbers of the actual principal funding amount and Purchased Amount as well as the names/letterheads of the lenders, the NewCo Agreement is nearly identical to the MCA Servicing Agreement in wording and substance.

141.    Given the above facts, there is good reason to believe that at the very least, NewCo and Simmons (including MCA Servicing)—if not also United First and CloudFund—are all shell affiliates and/or aliases of each other.

142.    Neither NewCo's nor Simmons's signature appears anywhere in the NewCo Agreement. *See generally* Ex. J.

143.    NewCo agreed to provide Jambys with $100,000.00 in funds pursuant to the NewCo Agreement. Ex. J*,* at p.1.

144.    In exchange, Jambys purportedly agreed to sell a percentage of all of Jambys's "payments, receipts, settlements and funds paid to or received" by Jambys "in payment or settlement of [Jambys's] existing and future accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from [Jambys's] customers and/or payors or obligors" until the "Purchased Amount" of $142,000.00 was paid in full. *Id.*

145.    According to the NewCo Agreement, the Purchased Amount would be debited by NewCo from Jambys's designated account in daily increments per business day and NewCo may collect twice the amount on any date following a United States banking holiday. *Id.* The daily increments debited by NewCo are defined in the NewCo Agreement as the daily "Remittance," which the NewCo Agreement claims is a "good faith estimate" of "NewCo's share of future revenue stream." *Id.*

146.    The Remittance under the NewCo Agreement is identified as $1,184.00. Ex. J at p.1.

147.    The NewCo Agreement expressly states that Jambys "is selling a portion of a future revenue stream to [NewCo] at a discount, and is not borrowing money from [NewCo], therefore there is no interest rate or payment schedule and no time by which the Purchased Amount must be collected by [NewCo]." Ex. J, at p.1.  Despite this, the NewCo Agreement behaved as a loan in that it provided Jambys with funding in exchange for payments resulting in a repayment amount (*i.e.,* principal plus interest), higher than the amount funded (*i.e.,* principal).

148.    Although the NewCo Agreement claims that the daily Remittance is based on Jambys's future revenue stream, the Remittance is completely disconnected from any fluctuations in Jambys's revenue. The Remittance amount is not altered simply because Jambys's revenue changes and is in fact completely up to NewCo's sole discretion.

149.    The NewCo Agreement purports to provide a mechanism for adjusting the amount of the Remittance. *See id.* §1.4. However, it is impossible to utilize it because it only allows adjustment if no Event of Default has occurred, which includes not having sufficient funds in the designated account, any notification by Jambys that it intends to breach the agreements by not making the daily debits or otherwise, changes being made to the designated account's login information, the maintenance of other bank accounts without NewCo's consent, and a slew of other items. *Id.* §§ 1.4, 3.1. Similarly, the NewCo Agreement also purports to allow for reconciliation of the Remittance, but only in the absence of a default. *Id.* § 1.3. In other words, if Jambys does not have enough funds in its account to cover the daily Remittance, it is not permitted to seek an adjustment or reconciliation to the daily Remittance. Thus, the NewCo Agreement renders it virtually impossible to obtain a change in the daily remittance even with an actual change

in revenue, despite being characterized as a "revenue purchase agreement." In reality, the NewCo Agreement is a usurious loan, cloaked as a purchase of revenue.

150.    The dollar amount of interest earned by NewCo pursuant to the NewCo Agreement may be determined by calculating the difference between the "Purchased Amount" and the "Purchase Price" and then dividing that number by the "Purchase Price."

151.    Under the NewCo Agreement, the dollar amount of interest earned by MCA Servicing in dollars is $42,000.00 ($142,000.00 minus $100,000.00) over the loan term of approximately 120 daily Remittances.

152.    Utilizing the New York Attorney General's interest calculation formula of **(A/P)/(T/M)**, the annual interest rate of the NewCo Agreement is *at least* **87.90**%. That is more than three times the maximum of 25% permitted by New York's criminal usury statute.

153.    The NewCo Agreement was designed to ensure that NewCo would be repaid in full – no matter what changes occur in Jambys's revenue – by including personal guarantees executed by the Jambys Officers. *See* Ex. J at p.6 and § 3.2. The NewCo Agreement provided that upon any Event of Default, NewCo could seek immediate payment of all amounts due by Jambys from the Jambys Officers, including, but not limited to, all losses and damages incurred by NewCo in enforcing the NewCo Agreement. *Id.* This included all expenses and attorneys' fees incurred by NewCo in connection with the enforcement of the MCA Servicing Agreements. *Id.*

154.    The NewCo Agreement also ensured that NewCo would be paid by purportedly granting NewCo with a security interest, under the Uniform Commercial Code, in all of Jambys's assets, including, but not limited to, "all accounts, chatter, documents, equipment, general intangibles, instruments and inventory," "all proceeds,"  "all funds at any time in [Jambys' or

Jambys Officers'] accounts," "present and future electronic check transactions," and "any amount which may be due to NewCo under the [NewCo Agreement]." *Id.* at p.5.

155. Upon Jambys's execution of the NewCo Agreement, NewCo provided Jambys with $142,000.00 in funding (after accounting for fees) and began debiting Jambys's bank account in accordance with the NewCo Agreement.

156. On or about July 20, 2023, Jambys completed its payments under the NewCo Agreement.

### F.   SellersFi Agreement

157. On or about January 17, 2024, Jambys signed the SellersFi Agreement. Unlike the MCA Agreements discussed above, the SellersFi Agreement is titled as a loan agreement. *See generally* Ex. K.

158. Additionally, unlike the MCA Agreements, the SellersFi Agreement is transparently structured as the provision of a principal loan of $250,000 in exchange for repayment thereof over the course of thirty-six bi-weekly terms (approximately one-and-a-half years) with an annual interest rate of 21%. *Id.* at p. 1.

159. Like the MCA Agreements, the SellersFi Agreement requires that the Jambys Officers act as personal guarantors of Jambys's liability under the agreement. *Id.* §§ 5.1 – 5.5.

160. The SellersFi Agreement also provides SellersFi with a security interest, under the Uniform Commercial Code, in a laundry list of nearly all of Jambys's assets, including but not limited to its receivables, commercial papers, equipment, and inventory. *Id.* § 1.10.

161. SellersFi timely filed a UCC-1 financing statement in Delaware on January 22, 2024. *See* Ex. L.

162.    To date, the Debtors' records show they have repaid approximately $40,222.60 toward their obligations under the SellersFi Agreement.

## II.    The MCA Agreements Are Usurious Loans

163.    Despite the MCA Lenders' attempts to characterize the MCA Agreements as purchases of revenue or future receipts, the MCA Agreements are usurious loans prohibited by New York law.

164.    The MCA Lenders did not take on the benefits and risks of ownership under the MCA Agreements, which occurs with any purchase. The MCA Agreements provide that a specific sum will be paid to the MCA Lenders over time, irrespective of how Jambys's business is performing. As set forth below and in the accompanying Stay Extension Brief, the characteristics of these "purchases" demonstrate that the MCA Agreements were not purchases or revenue at all, but loans disguised as purchases in order to avoid New York's prohibition on usurious interest rates.

165.    New York courts consider the following factors in determining whether a cash advance or purchase of revenue is in fact a loan: (1) "the discretionary nature of the reconciliation provisions"; (2) "allegations that defendants refused to permit reconciliation"; (3) "the selection of daily payment rates that did not appear to represent a good faith estimate of receivables"; (4) "provisions making rejection of an automated debit on two or three occasions without prior notice an event of default entitling defendants to immediate repayment of the full uncollected purchase amount;" and (5) "provisions authorizing defendants to collect on the personal guaranty in the event of plaintiff's inability to pay or bankruptcy." *Davis v. Richmond Cap. Grp.,* 194 A.D.3d 516, 517 (1st Dep't 2021).

166.    As described above, it was completely up to the the MCA Lenders' sole discretion whether to utilize the reconciliation and adjustment provisions in the MCA Agreements. In fact, Jambys's inability or failure to make certain payments disqualified Jambys from being able to invoke those provisions.

167.    The daily amounts debited from Jambys's account were in no way tied to Jambys's actual revenue that the MCA Lenders were supposedly purchasing. Indeed, when Jambys began having difficulty making its payments, not one of the MCA Lenders took steps to determine Jambys's actual revenue or adjust the payment amounts accordingly.

168.    Although some of the MCA Lenders negotiated new payment schedules with Jambys, those schedules were never tied to the actual revenue being earned by Jambys. Rather, the schedules were aimed towards ensuring that the "purchased" amount was paid in full within a time frame required by the MCA Lenders.

169.    The MCA Agreements were subject to specified term lengths, that being the amount of time that it would take to pay off the amounts "purchased" by Defendants based on the daily debits. The length of the transactions did not vary based on fluctuations in Jambys's revenue.

170.    The MCA Agreements identified the failure to make the required payments as a default, disqualifying Jambys from being able to seek reconciliation of or adjustments to the payment amount,s and requiring the immediate repayment of the full amount.

171.    Further, the MCA Agreements ensured that the MCA Lenders would be able to recover the full amount due despite changes in Jambys's revenue by requiring personal guarantees of the Jambys Officers.

172.    While the wording of the guarantees vary slightly, each of them require complete and immediate payment of the full amount allegedly "purchased" by the the MCA Lenders,

including any accrued fees, as well as attorneys' fees and expenses incurred by the MCA Lenders as a result of Jambys's default. This is a quintessential feature of a loan and is in no way connected to the amount of Jambys's actual revenue.

173.    The MCA Agreements provide exception to the MCA Lenders' right to repayment even in the event of Jambys's insolvency or bankruptcy, further demonstrating that they are loans and not purchases of revenue.

174.    The MCA Agreements also purport to provide that the MCA Lenders with a security interest under Article 9 of the Uniform Commercial Code. These secured interests ensure that the MCA Lenders' claims for payment receive priority in the event of a Jambys bankruptcy.

175.    The interest rate of these loans far exceeds the maximum criminal rates permitted under New York law. The loans are therefore illegal, criminally usurious, and void *ab initio*.

## COUNT ONE

**(Extension of the Automatic Stay to Enjoin The Loan Actions
Against the Jambys Officers – Against All Defendants Except NewCo)**

176.    Jambys repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

177.    Jambys seeks an injunction to stay all prosecution and/or enforcement of the Loan Actions against the Jambys Officers under Sections 105(a) and 362(a) of the Bankruptcy Code until its expiration under the terms of Debtors' plan of reorganization.

178.    Bankruptcy Code § 362(a)(1) stays the commencement or continuation of any action or proceeding against a debtor. Although the stay applies to debtors, court may extend the stay under Bankruptcy Code § 362 to non-debtors in order to uphold the integrity of the debtor's estate and provide the debtor with the full protections of the automatic stay. A bankruptcy court may extend the automatic stay to a non-debtor if the debtor and non-debtor share an identity of

interest such that a suit against the non-debtor is essentially a suit against the debtor, or where the action against the non-debtor will have an adverse impact on the debtor's reorganization.

179.    Under section 105(a), the Bankruptcy Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." This Court may enjoin actions against third parties where necessary to preserve the Debtors' restructuring efforts, including by fully effectuating the protections of the automatic stay under section 362(a). Such relief is particularly appropriate here, where it is necessary to protect Jambys's ability to successfully navigate the restructuring process, and negotiating and confirming a chapter 11 plan. The Court may, therefore, issue an injunction under section 105(a) to stay the Loan Actions.

180.    A stay extension is warranted under both of these standards, each of which independently justifies the relief requested herein. As discussed in more detail in the Stay Extension Brief filed contemporaneously herewith, absent an order enjoining the Loan Actions, Jambys will suffer immediate and irreparable harm that will threaten the integrity of these bankruptcy proceedings.

181.    First, because the Loan Actions all involve substantially the same allegations and issues pertaining to guarantees provided by the Jambys Officers, any judicial determination against the Jambys Officers under such guarantees will raise significant collateral estoppel concerns and potential evidentiary prejudice to the Debtors should the Debtors fail to participate in the MCA Actions. Second, by way of Jambys's corporate articles and bylaws, the Debtors and their estates have indemnification obligations to the Defendants requiring Jambys to pay costs and expenses incurred in connection with liabilities incurred by the Jambys Officers in their capacities as directors, officers, or agents of Jambys. Third, if the MCA Actions are permitted to proceed, any

judgment against the Jambys Officers would require a finding that the MCA Agreements are enforceable, which would effectively be a judgment that they are enforceable against the Debtors, thus affecting the Debtors' estates and threatening the recovery of creditors. Fourth, the threat that an adverse judgment will subsequently be used against the Debtors will compel the Debtors to participate in the Loan Actions in order to protect the Debtors' interests, including by the efforts necessary to prepare for and attend hearings, to assist in preparing pleadings and discovery responses, to spend time preparing for and participating in depositions, and to help analyze and develop legal defenses. Those efforts will distract the Debtors from the restructuring process and require them to divert resources away from the effort to consummate a successful chapter 11 plan.

182.    The balance of the harms and the public interest weighs in favor of enjoining all of the Loan Actions. The Defendants will not be harmed by the requested injunctive relief.

## <u>COUNT TWO</u>

**(Declaratory Judgment That The MCA Agreements Are Criminally Usurious and Thus Void Under New York Penal Law § 190.40 – Against the MCA Lenders)**

183.    Jambys repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

184.    A transaction cloaked as a purchase of future revenues or receipts may constitute a usurious loan prohibited by New York law.

185.    Despite their titles, the MCA Agreements do not constitute purchase agreements, but rather, are loans obligating Jambys to repay funds provided by the MCA Lenders with accrued interest.

186.    The interest rates of the loans issued under the MCA Agreements far exceed 25% per annum, which is the maximum interest rate permitted under New York criminal usury law. The MCA Agreements, therefore, are illegal usurious loans prohibited by New York law.

187.    By making such loans, the MCA Lenders intended to impose and collect interest in excess of 25% of their respective loan principals.

188.    Usurious loans are void and unenforceable under New York law, rendering both the principal and interest uncollectible. *Adar Bays, LLC v. Gene SYS ID, Inc.,* 37 N.Y.3d 320, 332-33 (2021); *see also* N.Y. Penal Law § 190.40.

189.    Despite this, the MCA Lenders have taken coercive actions seeking to enforce the payment obligations allegedly imposed on Jambys pursuant to the MCA Agreements, including, but not limited to, making demands for payments, filing suit against Jambys and the Jambys Officers, and/or imposing liens on Jambys's business accounts.

190.    An actual and justiciable controversy therefore exists between Debtors and the MCA Lenders about whether the MCA Agreements are enforceable purchase agreements or usurious loans prohibited by New York law.

191.    Accordingly, Jambys seeks and is entitled to a judgment declaring that the MCA Agreements are usurious loans prohibited by New York law, directing the MCA Lenders to cease all collection efforts under the MCA Agreements, and ordering the MCA Lenders to return to Jambys all principal and interest payments made pursuant to the MCA Agreements.

## COUNT THREE

**(Declaratory Judgment That Any Liens Filed Pursuant To The MCA Agreements
Are Void and Have No Priority – Against the MCA Lenders)**

192.    Jambys repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

193.    The Court's determination of the validity, priority, or extent of a creditor's liens asserted against property of the estate is a core proceeding under 11 U.S.C. § 157(b)(2)(k).

194. The Court may declare the rights of any interested party seeking the declaration, and the declaration shall have the force and effect of a final judgment. 28 U.S.C. § 2201(a).

195. Pursuant to Rule 7001(2) of the Federal Rules of Bankruptcy Procedure, the Court may entertain a declaration action to determine the validity, priority, or extent of a lien or other interest in property of the estate.

196. Certain of the MCA Lenders have filed UCC-1 liens against Debtors arising from Jambys' failure to make certain payments under the MCA Agreements.

197. As demonstrated herein, the MCA Agreements are usurious loans, and therefore, void and unenforceable under New York law.

198. Therefore, there is no debt upon which the UCC-1 security interest may attach.

199. Moreover, as discussed above, the MCA Actions taken in furtherance of the liens filed by Velocity, United First, and CloudFund had no basis in law or fact.  Nonetheless, those MCA Lenders' actions in asserting these baseless liens caused significant confusion to the Debtors' vendors and payment processing partners, which in turn caused prejudice to the Debtors and their business, meaningfully interfered with the Debtors' operations and ongoing restructuring efforts, and significantly hastened the Debtors' need to seek relief under chapter 11 sooner than envisioned.

200. The declaratory judgment sought by Jambys is not duplicative of other matters to be resolved as part of the claims in this action. Of necessity in fact is the Court's resolution of these issues at the outset of this action is necessary to the Court's determination of the remaining claims brought herein.

201. Accordingly, a judicial determination and declaration are therefore necessary to declare that the MCA Lenders do not have a secured interest in any collateral.

## COUNT FOUR

**(Constructive Fraudulent Transfers Pursuant to
11 U.S.C. § 548(a)(1)(B) – Against the MCA Lenders)**

202.     Jambys repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

203.     A debtor may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtors, that was made or incurred on or within two years before the petition date if the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation; and, inter alia, the debtor was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

204.     Jambys seeks to avoid the transfers made to the MCA Lenders within the last two years (the "Fraudulent Transfers") and to recover the value thereof from the MCA Lenders. Attached hereto as **Exhibit N** is a list of the Debtors' bank transactions with the MCA Lenders during the two years prior to the Petition Date, which were pursuant to the MCA Agreements attached as **Exhibits C through K**.

205.     Each of the Fraudulent Transfers was a transfer within the meaning of 11 U.S.C. § 101(54).

206.     Each of the Fraudulent Transfers was a transfer of property, or of an interest in property, of the Debtors to and/or for the benefit of the MCA Lenderss.

207.     Each of the Fraudulent Transfers was made at a time when the Debtors were insolvent or were rendered insolvent by the transfer.

208.     The Debtors did not receive a reasonably equivalent value in exchange for any of the Fraudulent Transfers.

209.     The MCA Lenders did not take the Fraudulent Transfers in good faith.

210.     Accordingly, the Fraudulent Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B).

## COUNT FIVE

**(Preferential Transfers Pursuant to 11 U.S.C. § 547(b) – Against MCA Lenders)**

211.     Jambys repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

212.     Within ninety (90) days prior to the Petition Date, the Debtors made numerous transfers to or for the benefit of the MCA Lenders ("Preferential Transfers"). Attached hereto as **Exhibit O** is a list of the Debtors' bank transactions with the MCA Lenders during the 90 days prior to the Petition Date.

213.     The Preferential Transfers were made by Debtors and constituted a transfer of an interest in the property of the Debtors.

214.     Defendants were creditors of the Debtors by virtue of the Loan Agreements pursuant to which Debtors were required to make certain payments.

215.     The Preferential Transfers were made to or for the benefit of a creditor within the meaning of 11 U.S.C. § 547(b)(1) because the Preferential Transfers either reduced or fully satisfied the debts owed by Debtors to the MCA Lenders.

216.     The Preferential Transfers were made on or within 90 days before the Petition Date.

217.     The Preferential Transfers were made while the Debtors were insolvent.

218.     The Preferential Transfers were each made for, or on account of, an antecedent debt or debts owed by the Debtors to the Defendants before such transfers were made, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) prior to being paid by Debtors.

219.    As a result of the Preferential Transfers, the Defendants received more than they would have received if: (i) the chapter 11 cases were under chapter 7 of the Bankruptcy Code;  (ii) the Preferential Transfers had not been made; and (iii) the Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

220.    Accordingly, the Preferential Transfers are avoidable pursuant to section 547(b) of the Bankruptcy Code.

## COUNT SIX

### (Recovery of Avoidable Transfers – Against All Defendants)

221.    Jambys repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

222.    The Debtors made the Fraudulent Transfers and the Preferential Transfers to or for the benefit of the Defendants.

223.    The Defendants are the initial transferees or the immediate, mediate or subsequent transferees of the Fraudulent Transfers and Preferential Transfers.

224.    The Debtors may recover, and intend to recover, the Fraudulent Transfers and the Preferential Transfers and the benefits therefrom from any and all mediate, immediate, and subsequent transferees.

## COUNT SEVEN

### (Unjust Enrichment – Against the MCA Lenders)

225.    Jambys repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

226.    The Debtors provided the MCA Lenders with numerous payments pursuant to the MCA Agreements, which are void *ab initio* as criminally usurious and against public policy.

227.    As a result thereof, the MCA Lenders each realized a material benefit to the detriment of the Debtors.

228.    It would be against equity and good conscience to permit the MCA Lenders to retain the benefit of the payments of the usurious loans.

229.    Accordingly, the MCA Lenders have been unjustly enriched at the Debtors' expense.

WHEREFORE, the Debtors pray the Court to enter an order:

a.    Declaring that the automatic stay applies to the Loan Actions against the Jambys Officers and enjoining those Loan Actions against the Jambys Officers;

b.    Declaring that the MCA Agreements are criminally usurious and void;

c.    Directing the MCA Lenders to cease all collection efforts under the MCA Agreements;

d.    Directing the MCA Lenders to return all payments made by Debtors to the MCA Lenders, including all payments towards principal, interest and fees;

e.    Declaring that any liens filed pursuant to or in connection with the MCA Agreements are void and have no priority;

f.    Avoiding and restoring all Fraudulent Transfers;

g.    Avoiding and restoring all Preferential Transfers;

h.    Directing the MCA Lenders to pay compensatory damages to the Debtors;

i.    Awarding attorneys' fees and costs; and

j.    All other relief that this Court deems just and proper.

Dated:  May 9, 2024             **PASHMAN STEIN WALDER**
        Wilmington, Delaware       **HAYDEN, P.C.**

*/s/ Joseph C. Barsalona II*
Joseph C. Barsalona II (No. 6102)
1007 North Orange Street 4th Floor #183
Wilmington, DE 19801-1242
Telephone: (302) 592-6496
Email: jbarsalona@pashmanstein.com

-and-

Denise Alvarez (*pro hac vice* pending)
Joshua P. Law (*pro hac vice* pending)
Court Square
21 Main Street, Suite 200
Hackensack, New Jersey 07601
Email: dalvarez@pashmanstein.com
      jlaw@pashmanstein.com

*Counsel to the Plaintiffs*

## <u>VERIFICATION</u>

I, John Tate Ambrose, certify that I am a duly authorized representative of the Plaintiffs.  I have read the foregoing Verified Complaint and can attest that the factual allegations contained in the foregoing paragraphs are accurate to the best of my knowledge.  I am informed and believe that the foregoing information is true and accurate based upon my own knowledge and my review of the business records maintained by the Plaintiffs in the regular course of their business, except as to the matters therein stated to be alleged upon information and belief; and as to those matters I believe them to be true.

Dated:   May 9, 2024                          **Jambys, Inc.; Jambys NYC, Inc.**
         New York, NY


                                              */s/ John Ambrose*
                                              John Ambrose
                                              President & Co-CEO

48