## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| JAMBYS, INC., ET AL., | Case No. 24-10913 (KBO) |
| Debtors.[1] | Jointly Administered |

| | |
|---|---|
| JAMBYS, INC., | Chapter 11 |
| Plaintiff, | Adv. Pro. No. 24-50065 (KBO) |
| v. | |
| VELOCITY CAPITAL GROUP LLC, UNITED FIRST, LLC, GLOBAL FUNDING EXPERTS, LLC, GFE NY LLC, MCA SERVICING COMPANY, CLOUDFUND LLC, DELTA BRIDGE FUNDING, LLC, MAX RECOVERY GROUP LLC, SIMMONS CAPITAL PARTNERS, NEWCO CAPITAL GROUP VI LLC a/k/a NEWCO CAPITAL GROUPS VI, SELLERSFUNDING CORP. d/b/a SELLERSFI, ASSDJS LLC, ASSDJS 2 LLC, JAY AVIGDOR, BORIS MUSHEYEV, VIACHESLAV ELIYAYEV, BARTOSZ MACZUGA, VADIM SEREBRO, and MATT SIMMONS, | |
| Defendants. | |

## FIRST AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are as follows: Jambys, Inc. (4264) and Jambys NYC, Inc. (5373).  The Debtors' mailing address is 228 Park Avenue South, PMB 49630, New York, NY 10003.

Jambys, Inc. and Jambys NYC, Inc. (collectively, "Jambys" or the "Debtors"),[2] as the debtors and debtors in possession in the above-captioned bankruptcy cases and plaintiffs in this adversary proceeding, allege for their First Amended Verified Complaint ("Complaint"), upon knowledge of their own acts and upon information and belief as to other matters, as follows:

### NATURE OF THE ACTION AND THE NEED FOR RELIEF

1.     This is an adversary proceeding brought pursuant to Rules 7001(1), 7002(2), 7001(7), 7001(9), and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and sections 105(a) and 362 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). By this adversary proceeding, Jambys seeks to extend the automatic stay and to enjoin the prosecution of the Loan Actions (defined below) against the corporate owners, directors, and officers of Jambys, John Tate Ambrose and Andrew Lee Goble (the "Jambys Officers"), including the enforcement of any personal guarantees and liens against the Jambys Officers.

2.     Specifically, the Jambys Officers were required to respond to a complaint filed by Velocity (defined below), a predatory lender, by **Monday, May 13, 2024**. The Jambys Officers cannot respond to the complaint because any response will require the Debtors' participation. Without an injunction extending the automatic stay to include the Jambys Officers, Velocity will likely pursue a default judgment. For the reasons explained herein and in the accompanying *Memorandum of Law in Support of the Debtors' Emergency Motion for an Order (I) Declaring that the Automatic Stay Applies to Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Pending a Final*

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Declaration of John Ambrose in Support of First Day Relief* [*In re Jambys, Inc.*, No. 24-10913-KBO (Bankr. D. Del.) D.I. 8] (the "First Day Declaration").

*Hearing* (the "Stay Extension Brief"), the Debtors will need to participate in any action arising out of personal guarantees of the Jambys Officers and will suffer irreparable harm if they are forced to expend their limited resources and attention to the Velocity matter. Emergent injunctive relief is therefore necessary to protect the Debtors and their restructuring efforts.

3.      Jambys further seeks to have various MCA Agreements (defined below) declared void on the grounds that they are usurious and unconscionable in that they are loans disguised as purchase agreements with interest rates far exceeding the New York criminal maximum of 25%. Jambys is therefore entitled to a declaration that the MCA Agreements are void and unenforceable, and the return of all the principal, fees, and interest that Jambys paid on these loans. Alternatively, any amounts paid by Debtors under the Loan Agreements two years prior to the Petition Date, as well as ninety (90) days prior to the Petition Date must be returned to the Debtors' estate as avoidable transfers pursuant sections 547(b), 548(a)(1)(B), and 550 of the Bankruptcy Code.

4.      Additionally, Jambys seeks to recover treble damages and attorneys' fees under the Racketeering Influenced and Corrupt Organizations Act ("RICO") from the MCA RICO Defendants (defined below) as they each participated in an association-in-fact enterprise with the goal of soliciting, funding, servicing, and collecting upon criminally usurious loans, the interest rates of which ranged between at least 55% and 138%. The MCA RICO Defendants' agreements to issue usurious loans, and their actions in actually funding the usurious loans and seeking to collect the unlawful debts, constitute a pattern of racketeering activity prohibited by 18 U.S.C. §§ 1962(c) and (d). Thus, Jambys is entitled to collect both treble damages, as well as attorneys' fees and costs under RICO.

5.      Between January and November 2023, Jambys purportedly entered into multiple agreements pursuant to which funding companies supposedly agreed to purchase revenue from

Jambys, in exchange for a specified amount to be paid by Jambys to those funders over time (the "MCA Agreements").

6.      Under the MCA Agreements, Jambys is obligated to pay the funders a specified amount on a daily basis up to a final number, amounting to tens of thousands of dollars more than the original amount funded.

7.      On or about January 17, 2024, Jambys also entered into a loan agreement (the "SellersFi Agreement", and collectively with the MCA Agreements, the "Loan Agreements") with Defendant SellersFunding Corp. ("SellersFi").

8.      The Jambys Officers personally guaranteed Jambys's obligations under the Loan Agreements.

9.      In addition, Jambys's corporate bylaws and articles of incorporation require Jambys to indemnify the Jambys Officers to the extent they incur any liability "actually and reasonably incurred in connection with any proceeding" arising out of their capacities as directors, officers, or agents of Jambys. Attached as **Exhibits A and B** hereto are true and correct copies of the Certification of Incorporation and Corporate Bylaws of Jambys, Inc., respectively.  *See* Ex. A, Art. VI; Ex. B § 6.1.

10.     Although the MCA Agreements are titled as "revenue purchase agreements" or "future receipts sale and purchase agreements," many of them are loans claiming to be purchase agreements to avoid being subject to New York's criminal usury statute.

11.     With the exception of SellersFi, each of the Defendants herein are funders, brokers, and/or servicing agents of the MCA Agreements (all Defendants other than SellersFi, collectively, the "MCA Lenders"). They have either sued Jambys and the Jambys Officers for amounts allegedly due and owing under the MCA Agreements, have had liens issued against Jambys, and/or

threatened suit or other coercive actions to collect amounts allegedly due by Jambys under the MCA Agreements (the "MCA Actions", and collectively with any efforts to enforce the SellersFi Agreement, the "Loan Actions").

12.    New York courts, however, have held that cash advances such are these are nothing more than loans that violate both New York's criminal usury statute and RICO. *See, e.g., Crystal Springs Cap., Inc. v. Big Thicket Coin,* LKC, 220 A.D.3d 745, 747 (2d Dep't 2023); *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC,* 2023 WL 3882697 (2d Cir. June 8, 2023).

13.    Indeed, the Attorney General for the State of New York recently filed suit against many revenue funders (including some of the MCA Lenders subject to this Complaint), alleging that they are guilty of criminal usury and fraud, and seeking, among other things, rescission of the agreements and restitution and damages to paid to all merchants. *See People v. Yellowstone Cap. LLC*, Index No. 450750/2024, Doc. No. 1 (N.Y. Sup. Ct. New York Cnty. March 5, 2024) (the "NYAG Complaint").[3]  The MCA Agreements here are similar, and thus, the Court should deem the MCA Agreements, including the guarantees, unconscionable and void.

14.    In addition to an order declaring the MCA Agreements void, Jambys also seeks a temporary restraining order and preliminary injunction against all of the Loan Actions to avoid irreparable harm to its estate and the prospect of a successful reorganization that would occur if the Loan Actions were allowed to continue unabated.  The theories of liability asserted against the Jambys Officers are the same as the theories asserted against Jambys because the Jambys Officers are sued as alleged guarantors of the Loan Agreements. Because Jambys shares an identity of interest with the Jambys Officers and has an obligation to indemnify them for the guarantees they

---

[3] A copy of the NYAG Complaint is available on the New York Attorney General website:
https://ag.ny.gov/sites/default/files/2024-03/nyag-v-yellowstone-et-al.pdf

provided for the Debtors' financing, a uniform stay of all Loan Actions is necessary to avoid irreparable harm to Jambys's restructuring efforts.

15.     Absent a stay, Jambys's restructuring efforts will be hindered by its necessary involvement in the Loan Actions, the threat of collateral estoppel or evidentiary prejudice, and the depletion of estate assets. Jambys would be required to participate in discovery, devote time preparing for and participating in depositions, and help analyze and develop the Jambys Officers' legal defenses to protect Jambys's interests.

16.     Moreover, if the Loan Actions are not stayed, Jambys risks significant prejudice arising from contractual indemnification provisions providing that Jambys and the Jambys Officers must indemnify the funders of the MCA Agreements for any legal fees and expenses they incur as a result of monies owed to them by Jambys. And of course, Jambys risks potential collateral estoppel and evidentiary prejudice based on any factual or legal findings made against the Jambys Officers. Avoiding such harms will require Jambys's direct and substantial involvement in the litigation, drain Jambys's resources, prejudice other stakeholders, and divert time and attention away from maximizing value for the benefit of all stakeholders through implementing a strategic chapter 11 transaction.

17.     Defendants will not be materially prejudiced by an order staying or enjoining the Loan Actions.  Defendants face no imminent risk of harm or loss that would arise from the Loan Actions being stayed against the Jambys Officers. This is especially true in light of the significant likelihood that Jambys will be successful in demonstrating that the MCA Agreements are unconscionable and void as they are usurious loan agreements prohibited by New York law.

18.     The equities and the interests of justice weigh in favor of staying the Loan Actions, and the Court should grant the requested injunctive relief.

19.      On April 30, 2024 (the "Petition Date"), Jambys filed petitions seeking relief under chapter 11 of the Bankruptcy Code.

20.      On May 9, 2024, Jambys filed a Verified Complaint (the "Verified Complaint") against the MCA Lenders and SellersFi, seeking, *inter alia*, extension of the automatic stay as to the Jambys officers for their personal guarantees of Jambys's obligations; emergent injunctive relief enjoining commencement and/or continued prosecution of the Loan Agreements; declaratory judgment declaring the MCA Agreements criminally usurious and void; rescission of the MCA Agreements; and recovery of various preferential and/or fraudulent transfers to the MCA Lenders. [Adv. D.I. 1]. That same day, Jambys also filed a motion (the "Stay Motion") seeking emergent court intervention in granting the extension of the automatic stay and injunctive relief. [Adv. D.I. 2-5].

21.      On May 10, 2024, the Court held an emergency hearing on Jambys's Stay Motion and entered an Order (the "TRO") granting temporary restraints for fourteen days as to the Velocity Complaint (defined below) only, and setting a hearing for May 23, 2024 (the "P.I. Hearing") to determine the merits of Jambys's request for preliminary injunctive relief pending the final outcome of this adversary proceeding. [Adv. D.I. 15]. Jambys then served the TRO on all MCA Lenders and SellersFi. [Adv. D.I. 16].

22.      No objections were submitted by any of the MCA Lenders.

23.      Counsel for SellersFi reached out to Jambys with informal comments prior to the P.I. Hearing, which were incorporated by Jambys in a proposed order submitted under certification of counsel. [Adv. D.I. 21].

At the P.I. Hearing, the Court evaluated the relevant preliminary injunction factors and found that they weighed in favor of granting Jambys's requested relief. The Court then entered an Order (the

"P.I. Order") granting Jambys's request to extend the automatic stay to the Jambys Officers and to preliminarily enjoin the MCA Lenders from commencing and/or continuing to prosecute any MCA Actions against Jambys or the Jambys Officers. [Adv. D.I. 24]. Jambys then served the TRO on all MCA Lenders and SellersFi, [Adv. D.I. 25], and filed updated suggestions of bankruptcy in the outstanding state court enforcement actions filed by the MCA Lenders.

## JURISDICTION AND VENUE

24.     This adversary proceeding arises in and relates to Jambys's cases pending before this Court under chapter 11 of the Bankruptcy Code.

25.     The Court has jurisdiction to consider this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. The Court has subject matter jurisdiction over the claims against the Jambys Officers pursuant to 28 U.S.C. §§ 157 and 1334. Related-to jurisdiction exists over the claims against the non-debtor Jambys Officers because (1) Jambys and the Jambys Officers share an identity of interest, based upon their shared and common purpose and Jambys' lead role in defending and resolving the MCA Actions, such that the claims against the Jambys Officers are, in effect, claims against Jambys's estate; (2) the claims against the Jambys Officers raise factual and legal questions that are substantially identical to, and inextricably intertwined with, those raised by the claims against Jambys; and (3) continued prosecution of claims against the Jambys Officers will have an adverse impact on Jambys's ability to reorganize.

26.     This is a core proceeding under 28 U.S.C. § 157(b), and Jambys confirms its consent, pursuant to Local Rule 9013-1(f), to the entry of a final order or judgment by the Court in connection with this adversary proceeding if it is determined that the Court, absent the consent

of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

27.     Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

28.     Jambys is a Delaware corporation operating out of New York that sells loungewear and sleepwear through its own ecommerce site (Jambys.com), certain online retailers, and select wholesale partners. Jambys's mission is to make comfortable apparel from premium fabrics to help consumers maximize their relaxation at home.

29.     Upon information and belief, Velocity Capital Group ("Velocity") is a New York limited liability company, with an office in Cedarhurst, New York. By agreement dated August 9, 2023 (the "Velocity Agreement"), Velocity agreed to provide Jambys with $95,000.00 in funding in exchange for payments amounting to at least $134,900.00, resulting in an annualized interest rate of at least **81.91%**. Attached as **Exhibit C** hereto is a true and correct copy of the Velocity Agreement. The Velocity Agreement is governed by New York law. *See* Ex. C § 4.5.

30.     Jay Avigdor is the founder, owner, President, and Chief Executive Officer of Velocity Capital Group and, upon information and belief, a resident of the State of New York.

31.     Upon information and belief, United First, LLC ("United First") is a New York limited liability company, with offices in Miami, Florida and in Queens, New York. By agreement dated August 24, 2023 (the "United First Agreement"), United First agreed to provide Jambys with $362,000.00 in funding in exchange for payments amounting to at least $507,043.00, resulting in an annualized interest rate of at least **55.11%**. Attached as **Exhibit D** hereto is a true and correct copy of the United First Agreement. The United First Agreement is governed by New York law. *See* Ex. D § 21.

32.     Upon information and belief, Global Funding Experts, LLC ("GFE") is a New Jersey limited liability company, with the same office in Queens, New York as United First and Defendant GFE NY LLC. GFE is the servicing agent for the United First Agreement, and upon information and belief, GFE is either a trade name or corporate affiliate or alter ego of United First.

33.     Upon information and belief, GFE NY LLC ("GFE NY") is a New York limited liability company, with the same office in Queens, New York, as GFE and United First.  The GFE representatives with whom the Debtors communicated regarding the United First Agreement also listed GFE NY as their employer in their email signature blocks.

34.     Boris Musheyev is a co-founder, owner, and the Chief Executive Officer of GFE and, upon information and belief, a resident of the State of New York.

35.     Viacheslav Eliyayev is a co-founder and owner of GFE and, upon information and belief, a resident of the State of New York.

36.     Upon information and belief, United First, GFE, and GFE NY are corporate affiliates and/or alter egos of each other, sharing common corporate ownership, officers, directors, employees, and offices.

37.     Upon information and belief, CloudFund LLC ("CloudFund") is a New York limited liability company, with an office located in Suffern, New York. CloudFund agreed to provide funding to Jambys on at least three separate occasions.

a.     By agreement dated January 1, 2023 (the "January CloudFund Agreement"), CloudFund agreed to provide Jambys with $150,000.00 in funding in exchange for payments amounting to at least $224,850.00, resulting in an annualized interest rate of at least **89.96%**. Attached as **Exhibit E** hereto is a true and correct copy of the January CloudFund Agreement.

b.      By agreement dated July 6, 2023 (the "July CloudFund Agreement"), CloudFund agreed to provide Jambys with $260,000.00 in funding in exchange for payments amounting to at least $363,740.00, resulting in an annualized interest rate of at least **62.64%**. Attached as **Exhibit F** hereto is a true and correct copy of the July CloudFund Agreement.

c.      By agreement dated November 20, 2023 (the "November CloudFund Agreement", and collectively with the January CloudFund Agreement and July CloudFund Agreement, the "CloudFund Agreements"), CloudFund agreed to provide Jambys $345,600.00 in funding in exchange for payments amounting to at least $500,400.00, resulting in an annualized interest rate of at least **74.34%**. Attached as **Exhibit G** hereto is a true and correct copy of the November CloudFund Agreement.

d.      The CloudFund Agreements are governed by New York law.  *See* Exs. E, F, G § 38.

38.     Delta Bridge Funding, LLC ("Delta Bridge"), is the current servicing agent for the CloudFund Agreement, and is the same entity as or alter ego of CloudFund. As explained in the NYAG Complaint, CloudFund is simply a "brand name", "platform", and/or shell affiliate of Delta Bridge, created for the purpose of being named as the lender for the MCA lending agreements that Delta Bridge services. The NYAG Complaint further explains that CloudFund has no employees, officers, directors, offices, or telephone lines apart from those shared with Delta Bridge, and that "Delta Bridge . . . and CloudFund operate as a common enterprise." NYAG Complaint ¶¶ 73-81.

39.     Max Recovery Group LLC ("Max Recovery Group") is a New York limited liability company and shares common ownership with Delta Bridge and CloudFund. Max Recovery Group was the servicing agent for the CloudFund Agreement until or about March 19, 2024. *Id.* ¶¶ 94-95.

40.     Bartosz Maczuga is a co-founder, the Chief Executive Officer, and majority owner of Delta Bridge, and a resident of the State of Florida. *Id.* ¶¶ 92-93.

41.     Vadim Serebro is a co-founder, the General Counsel, Chief Strategy Officer, and part owner of Delta Bridge, and is also the General Counsel and sole owner and manager of Max Recovery Group; and a resident of the State of New York. *Id.* ¶¶ 94-95.

42.     Upon information and belief, MCA Servicing Company ("MCA Servicing") is a New York limited liability company, with an office in Pomona, New York. MCA Servicing agreed to provide Jambys with funding on at least two separate occasions.

a.      By agreement dated August 24, 2023 (the "August MCA Servicing Agreement"), MCA Servicing agreed to provide Jambys $125,000.00 in funding in exchange for payments amounting to at least $181,250.00, resulting in an annualized interest rate of at least **112.98%**. Attached as **Exhibit H** hereto is a true and correct copy of the August MCA Servicing Agreement.

b.      By agreement dated October 5, 2023 (the "October MCA Servicing Agreement", and collectively with the August MCA Servicing Agreement, the "MCA Servicing Agreements"), MCA Servicing agreed to provide Jambys another $70,000.00 in funding in exchange for payments amounting to at least $104,300.00, resulting in an annualized interest rate of at least **138.83%**. Attached as **Exhibit I** hereto is a true and correct copy of the October MCA Servicing Agreement.

43.     The MCA Agreements are governed by New York law. *See* Exs. H and I, § 4.5.

44.     Upon information and belief, NewCo Capital Group VI LLC, also known as NewCo Capital Groups VI LLC ("New Co") is a New York limited liability company, with an office in Monsey, NY.  By agreement dated January 26, 2023 (the "NewCo Agreement"), NewCo

agreed to provide Jambys with $100,000.00 in funding in exchange for payments amounting to at least $142,000.00, resulting in an annualized interest rate of at least **87.90%**. Attached as **Exhibit J** hereto is a true and correct copy of the NewCo Agreement.  The NewCo Agreement is governed by New York law.  *See* Ex. J, § 4.5.

45.    As explained by Ariel Bouskila ("Bouskila") of Berkovitch and Bouskila PLLC, who represented MCA Servicing in a separate New York state court proceeding, MCA Servicing and NewCo are the same entity; MCA Servicing is an assumed name of NewCo. *See MCA Servicing Co. v. Barker*, Index No. 814661/2022, NYSCEF No. 33, at 6 (N.Y. Sup. Ct. Erie Cnty. Apr. 14, 2023) (claiming that MCA Servicing Company is a "dba" of NewCo Capital Group VI LLC). Bouskila also represents MCA Servicing in the MCA Servicing Action (defined below) against Jambys. Moreover, a search of UCC-1 financing statements filed in Delaware against Jambys shows that a UCC-1 financing statement was filed by MCA Servicing Company against Jambys on or about January 30, 2023—less than one week after Jambys signed the NewCo Agreement, but over six months prior to the August MCA Servicing Agreement (defined below), which was the first agreement ever signed between Jambys and MCA Servicing.

46.    Upon information and belief, Simmons Capital Partners is an entity authorized to do business in New York, with an office at 1345 Ocean Parkway, Brooklyn, NY 11230.  Further upon information and belief, Simmons Capital Partners may also be a trade name or d/b/a used by either or both Defendants ASSDJS LLC and/or ASSDJS 2 LLC (collectively with Simmons Capital Partners, "Simmons Capital"), which have an office at 1345 Ocean Parkway, Brooklyn, NY 11230.

47.    Matt Simmons is the Senior Funding Manager and an owner of Simmons Capital.

48.     Simmons Capital brokered all of the MCA Agreements between Jambys and Velocity, United First, CloudFund, MCA Servicing, and NewCo. However, unlike the Velocity, United First, CloudFund, and MCA Servicing Agreements, which each bear the letterhead of each respective MCA Lender, for some unexplained reason, the NewCo Agreement instead bears the letterhead of Simmons Capital throughout the form.

49.     Upon information and belief, SellersFi is a Delaware corporation, with an office in Weston, Florida.  By agreement dated January 17, 2024, (the "<u>SellersFi Agreement</u>"), SellersFi provided $250,000 in funding to Jambys in exchange for a Note executed by Jambys providing for 21% interest per annum, to be repaid over thirty-six (36) bi-weekly terms.  Attached as **<u>Exhibit K</u>** hereto is a true and correct copy of the SellersFi Agreement.

## **<u>FACTUAL BACKGROUND</u>**

I.     **<u>The MCA Agreements</u>**

A.     **<u>The Velocity Agreement</u>**

50.     On or about August 9, 2023, Jambys signed the Velocity Agreement which is entitled "Revenue Purchase Agreement." Velocity's signature, however, does not appear anywhere in the Velocity Agreement. *See generally* Ex. C.

51.     Pursuant to the Velocity Agreement, Velocity agreed to provide Jambys with $95,000.00 in funds. *Id.* at p.1.

52.     In exchange, Jambys purportedly agreed to sell to Velocity, a percentage of all of Jambys's "future accounts, contract rights and other entitlements arising from or relating to the payment of monies from [Jambys's] customer's [sic] and/or other third party payors" until the "Purchased Amount" identified in the Velocity Agreement is paid in full. *Id.* The Velocity Agreement identifies the "Purchased Amount" as $134,900.00. *Id.* According to the Velocity

Agreement, the Purchased Amount would be debited by Velocity from Jambys's designated bank account in daily increments of $999 per business day. *Id.*

53.     The Velocity Agreement expressly states that Jambys "is selling a portion of a future revenue stream to [Velocity] at a discount, not borrowing money from [Velocity], therefore there is no interest rate or repayment schedule . . . ." Despite this, it is clear the Velocity Agreement is structured as a loan in that it provides Jambys with funding in exchange for payments resulting in a repayment amount (*i.e.,* principal plus interest), higher than the amount funded (*i.e.,* principal). *Id.*

54.     The daily increments debited by Velocity are defined in the Velocity Agreement as the daily "Remittance," which the Velocity Agreement claims is a "good faith estimate" of 20% of the "daily average revenues" of Jambys during the previous calendar month divided by the number of business days in the calendar month. *Id.*

55.     Although the Velocity Agreement claims that the daily Remittance is based on the percentage of revenue collected by Jambys, the Remittance is completely disconnected from any fluctuations in Jambys's revenue. The Remittance amount is not altered simply because Jambys's revenue changes and is in fact completely up to Velocity's sole discretion.

56.     The Velocity Agreement purports to provide a mechanism for adjusting the Remittance amount. *See id.* § 1.4. However, it is impossible to utilize it. For example, it only allows reconciliation of the remittance if the request is made by Jambys specifically two weeks after the Velocity provides the agreed-upon funding and only if the amount debited by Velocity was more than 20% of Jambys's total revenue since the date of the Velocity Agreement. Furthermore, no adjustment is permitted if there is an Event of Default, which includes having insufficient funds in the designated account, any interruptions to the daily debits, any changes with the bank or

designated account that Velocity considers adverse or unacceptable, and a slew of other items. *Id.* In other words, if Jambys does not have enough funds in its account to cover the daily Remittance, it is not permitted to seek an adjustment to that daily Remittance. Thus, the Velocity Agreement renders it virtually impossible to obtain a change in the daily remittance even with an actual change in revenue, despite being characterized as a "revenue purchase agreement." In reality, the Velocity Agreement is a usurious loan cloaked as a purchase of revenue.

57.     The dollar amount of interest earned by Velocity pursuant to the Velocity Agreement may be determined by calculating the difference between the "Purchased Amount" of $134,900.00 to be paid back by Jambys and the "Purchase Price" of $95,000.00, which is the amount funded by Velocity. That amount of interest is $39,900 over the Velocity Agreement term of approximately 138 daily Remittances.

58.     Utilizing the New York Attorney General's interest calculation formula of **(A/P)/(T/M)**,[4] the annual interest rate of the Velocity Agreement is *at least* **81.91%**, more than triple the maximum of 25% permitted by New York's criminal usury statute.[5]

59.     The Velocity Agreement is designed to ensure that Velocity will be repaid in full – no matter what changes occur in Jambys's revenue stream – by including personal guarantees executed by the Jambys Officers. *See* Ex. C at p.6. The Velocity Agreement provides that upon any Event of Default, Velocity may seek immediate payment of all amounts due by Jambys from the Jambys Officers, including, but not limited to, all losses and damages incurred by Velocity in

---

[4] Here, **"A"** represents the amount of interest, **"P"** represents the principal amount (or "Purchased Amount" here), **"T"** represents the number of days in the term, and **"M"** represents the number of business days in a year. *See* NYAG Complaint ¶ 462; *see also People v. Richmond Cap. Grp. LLC*, 80 Misc.3d 1213(A), at *10, 195 N.Y.S.3d 637 (N.Y. Sup. Ct. 2023) (adopting NYAG formula for purposes of calculating usurious interest rates from MCA lender defendants). The New York Attorney General assumes 251 business days in a year under this analysis. *Id.*

[5] Moreover, as with all of the other MCA Agreements, when the interest rate is calculated using the amount *received* by Jambys net of the various "fees" applied by each of the MCA lenders, the interest rate becomes even greater and more usurious.

enforcing the Velocity Agreement. *Id.* This includes all expenses and attorneys' fees incurred by Velocity resulting from any claims for monies allegedly owed to it by Jambys. *Id.* § 3.4.

60.     The Velocity Agreement also ensures that Velocity will be paid by purportedly granting Velocity with a security interest, under the Uniform Commercial Code, in all of Jambys's assets, including, but not limited to, "all accounts, chatter, documents, equipment, general intangibles, instruments and inventory," "all proceeds," "all funds at any time in [Jambys' or Jambys Officers'] accounts," "present and future electronic check transactions," and "any amount which may be due to Velocity under the [Velocity Agreement]." *Id.* at p.5.

61.     As noted above, Jambys, Inc. is a Delaware corporation.  Under sections 9-301 and 9-307(e) of Delaware's enacted Uniform Commercial Code, a creditor is required to file a UCC-1 financing statement in the company's state of incorporation, which for Jambys, Inc. is Delaware. *See* DEL. CODE. ANN. tit. 6, §§ 9-301; 9-307(e). Attached hereto as **Exhibit L** is a true and correct copy of lien searches run through the Delaware Secretary of State on April 15, 2024.  As shown herein, Velocity did *not* file a UCC-1 financing statement and is thus unsecured. Rather, Velocity filed a UCC-1 financing statement in Texas, which is wholly ineffective against the Debtors. Attached hereto as **Exhibit M** is a true and correct copy of Velocity's UCC-1 financing statement filed in Texas.

62.     Upon Jambys's execution of the Velocity Agreement in August 2023, Velocity provided Jambys with approximately $91,985.00 in funding (after accounting for fees) and began debiting Jambys's bank account at $999 per business day towards the $134,900.00 due to Velocity, under the Velocity Agreement.

63.     In early 2024, Jambys did not have sufficient funds in the designated account, resulting in bounced debits. The parties thereafter negotiated a payment plan and Jambys began making payments.

64.     On March 7, 2024, Jambys informed Velocity that it would not make any additional payments in light of the fact that Velocity Capital Group is named as a defendant in the New York Attorney General's Complaint and the Velocity Agreement is a usurious loan prohibited by New York law.

65.     On the same day, Velocity responded claiming that the "Velocity Capital Group" identified in the New York Attorney General's Complaint is a different entity and threatened legal action. *See* NYAG Complaint ¶ 57 (naming "Velocity Capital Group" as a DBA entity name/alter ego of World Global Capital LLC, a New York subsidiary of Yellowstone Capital LLC).

66.     However, a New York Department of State corporate search reveals that no other New York corporate entities exist under the name Velocity Capital Group other than Defendant Velocity.

67.     As of March 12, 2024, Jambys had paid approximately $120,930.00 to Velocity under the Velocity Agreement.

68.     On March 22, 2024, Velocity filed a Complaint (the "Velocity Action") in the Supreme Court of the State of New York, Kings County, against Jambys and the Jambys Officers, seeking to recover $28,184.00 plus attorneys' fees and expenses under the Velocity Agreement and Guaranty. The deadline for the Jambys Officers to file an answer in the Velocity Action is May 13, 2024.

69.     On April 22, 2024, Jambys received notice from Amazon.com's counsel that there was a hold on any disbursement of the funds contained in Jambys's account as a result of, *inter*

*alia*, a purported UCC-1 lien asserted by Velocity.  As noted above, the UCC-1 financing statement

was filed in Texas, and Velocity had no basis in fact or law to assert a lien on the Debtors' assets

held by Amazon.  On or around May 7, 2024, or one week after the Petition Date, Jambys was

able to secure a release of the hold on its Amazon account by demonstrating that Velocity had

failed to properly perfect its security interest.

### B.    The United First Agreement

70.    On or about August 24, 2023, Jambys signed the United First Agreement which is

entitled "Purchase and Sale of Future Receipts Agreement." United First's signature, however,

does not appear anywhere in the United First Agreement.  *See generally* Ex. D.

71.    Pursuant to United First Agreement, United First agreed to provide Jambys with

$362,000.00 in funds. *Id.* at p.2.

72.    In exchange, Jambys purportedly agreed to sell to United First, a percentage of all

of Jambys's "future receipts," defined to include "all payments made by cash, check, ACH or other

electronic transfer, credit card, debit card, bank card, charge card, . . . or other form of monetary

payment in the order course of [Jambys's] business" until the "Purchased Amount of Future

Receipts" is paid in full. The United First Agreement – which is itself internally inconsistent –

identifies that amount as $506,438.00, $506,998.00, or $507.043.00, depending on where one looks

in the Agreement. *See id.* at Offer Summary; *id.* at p.2.  Without making any concessions or

prejudice to its position, Jambys utilizes the lowest number, $506,438.00, for illustrative purposes

of the calculations herein only.

73.    According to the United First Agreement, the Purchased Amount of Future

Receipts would be debited by United First from Jambys's designated bank account in daily

increments of $2,779.00 per business day. *Id.* at p.2 and § 1.

74.     The United First Agreement expressly states that Jambys "is selling a portion of a future revenue stream to [United First] at a discount, not borrowing money from [United First]." *Id.* § 3. Despite this, the United First Agreement acts as a loan in that it provides Jambys with funding in exchange for payments resulting in a repayment amount (*i.e.,* principal plus interest), higher than the amount funded (*i.e.,* principal).

75.     The daily increments debited by United First are defined in the United First Agreement as the "Periodic Amount," which the United First Agreement claims is "intended to represent" 11% of Jambys's "actual Future Receipts." *Id.* at p.2 and § 1.

76.     Although the United First Agreement claims that the Periodic Amount is based on the percentage of Jambys's actual receipts, the Periodic Amount is completely disconnected from any fluctuations in Jambys's revenue. The Periodic Amount is not altered simply because Jambys's revenue changes and is in fact completely up to United First's sole discretion.

77.     The dollar amount of interest earned by United First pursuant to the United First Agreement may be determined by calculating the difference between the "Purchased Amount of Future Receipts" of $506,438.00 plus fees to be paid back by Jambys and the "Purchase Price" of $362,000.00, which is the amount funded by United First. That amount of interest is $144,438.00, over the loan term of approximately 182 daily Remittances.

78.     Utilizing the New York Attorney General's interest calculation formula of **(A/P)/(T/M)**, the annual interest rate of the United First Agreement is *at least* **55.11%**, almost double the maximum of 25% permitted by New York's criminal usury statute.

79.     The United First Agreement is designed to ensure that United First will be repaid in full – no matter what changes occur in Jambys's revenue stream – by including personal guarantees executed by the Jambys Officers. Ex. D at p.3 and § 17. The United First Agreement

provides that upon any Event of Default, United First may seek immediate payment of all amounts due by Jambys from both Jambys and the Jambys Officers, including, but not limited to, all of United First's costs in connection with Jambys's default. *Id.* § 14. This includes all reasonable expenses and attorneys' fees. *Id.* § 14.

80.    The United First Agreement also ensures that United First will be paid by purportedly granting United First with a security interest, under the Uniform Commercial Code, in all of "Future Receipts" in Jambys, as that term is defined in the United First Agreement. *Id.* § 12.

81.    As noted above, Jambys, Inc. is a Delaware corporation.  Under sections 9-301 and 9-307(e) of Delaware's enacted Uniform Commercial Code, a creditor is required to file a UCC-1 financing statement in the company's state of incorporation, which for Jambys, Inc. is Delaware. *See* DEL. CODE. ANN. tit. 6, §§ 9-301; 9-307(e). *See also* Ex. L (showing no Delaware UCC-1 filings by United First). As United First failed to file a UCC-1 financing statement in the correct jurisdiction, it is thus unsecured. Upon information and belief, Velocity filed a UCC-1 financing statement in New York, which is wholly ineffective against the Debtors.

82.    Upon Jambys's execution of the United First Agreement in August 2023, United First began providing Jambys with funding in accordance with the United First Agreement, which required that the funding be provided in seventeen (17) increments minus any fees. *See id.* at p.16. United First also began debiting Jambys's bank account at $2,779.00 per business day, as set forth in the United First Agreement.

83.    The United First Agreement was serviced by GFE.

84.    In January 2024, Jambys did not have sufficient funds for the daily debits, and certain debits were returned due to insufficient funds.  Jambys informed GFE that it could no longer

make the payments, and they negotiated a payment schedule pursuant to which Jambys made some delayed payments.

85.    In mid-February 2024, additional debits were returned due to insufficient funds.

86.    On March 7, 2024, GFE informed Jambys that it would be declaring a default and referring the matter to their legal department, which would result in a lawsuit being filed against Jambys. GFE also stated that it was in the process of filing a UCC lien against Jambys's business.

87.    On March 7, 2024, Jambys's counsel responded that would not make any additional payments in light of the fact that the United First Agreement is a usurious loan prohibited by New York law and contain terms substantially similar to the fundings agreements being challenged by the New York Attorney General. United First responded, disagreeing with Jambys's position.

88.    As of March 13, 2024, Jambys had paid approximately $273,228.00 to United First under the United First Agreement. United First, however, stopped providing Jambys with funding after the fourteenth (14) increment, despite the fact that the United First Agreement required United First to make seventeen (17) payments. United First's last funding payment to Jambys under the United First Agreement was on November 21, 2023, amounting to approximately $315,223.90 in total funding after accounting for fees.

89.    On April 22, 2024, Jambys received notice from Amazon.com's counsel that there was a hold on any disbursement of the funds contained in Jambys's account as a result of, *inter alia*, a purported UCC-1 lien asserted by United First.  As noted above, the UCC-1 financing statement was filed in New York, and United First had no basis in fact or law to assert a lien on the Debtors' assets held by Amazon.  On or around May 7, 2024, or one week after the Petition Date, Jambys was able to secure a release of the hold on its Amazon account by demonstrating that United First had failed to properly perfect its security interest.

C.      **The CloudFund Agreements**

90.     On or about January 27, 2023, Jambys signed the January CloudFund Agreement which is entitled "Future Receipts Sale and Purchase Agreement." *See generally* Ex. E.

91.     On or about July 6, 2023, Jambys signed the July CloudFund Agreement which is entitled "Future Receipts Sale and Purchase Agreement." *See generally* Ex. F.

92.     On or about November 20, 2023, Jambys signed the November CloudFund Agreement which is entitled "Future Receipts Sale and Purchase Agreement" *See generally* Ex. G.

93.     CloudFund's signature, however, does not appear anywhere in the CloudFund Agreements. *See generally* Exs. E, F, G.

94.     CloudFund agreed to provide Jambys with $150,000.00 in funds pursuant to the January CloudFund Agreement, $260,000.00 in funds pursuant to the July CloudFund Agreement, and $360,000.00 in funds under November CloudFund Agreement. *See* Exs. E, F, G at p.1.

95.     Each successive agreement was used to satisfy the immediately preceding loan, and further imposed additional "due diligence", "origination", and "UCC" fees. Thus, of the $150,000.00 to be provided by the January CloudFund Agreement, $7,576.00 was deducted to pay for fees, leaving a net amount of only $142,424.00 to be provided. Ex. E at p.1.

96.     Of the $260,000.00 to be provided under the July CloudFund Agreement, $53,660.00 was used to pay off the remaining balance of the previous loan and $13,000.00 was charged in new fees, leaving a net amount of only $193,340.00 to be provided. Ex. F at p.1.

97.     Similarly, of the $360,000.00 to be provided under the November CloudFund Agreement, $143,430.00 was used to satisfy the balance owed under the July CloudFund

Agreement and $14,400.00 was charged in new fees, leaving only a net amount of <u>$202,170.00</u> actually funded under the November CloudFund Agreement. Ex. G at p.1.

98.     Thus, CloudFund essentially consolidated the previous agreements into one superseding agreement, resulting in a total "funding amount" or "Purchase Price" of $360,000.00 under the November CloudFund Agreement. *Id.* However, though the total face value of the CloudFund Agreements' envisioned funding was $770,000.00, the amount actually provided to the Debtors was only <u>$537,934.00</u>, after accounting for the double-dipped fees and previous balance consolidations.

99.     In exchange, Jambys purportedly agreed to sell to CloudFund, a percentage of all of Jambys's "future receipts," defined to include "all of [Jambys's] receipts for the sale of good and services . . . which payments or deliveries of monies can be made in the form of cash, check, credit, charge or debit card, Automated Clearing House ("<u>ACH</u>") or other electronic transfer or any form of monetary payment and/or pecuniary benefit received from [Jambys]" until the "Purchased Amount" is paid in full. Exs. E, F, G §§ 1(c), 2, 3. The January CloudFund Agreement identifies the "Purchased Amount" as $224,850.00, the July CloudFund Agreement identifies the "Purchased Amount" as $363,740.00, and the November CloudFund Agreement identifies the "Purchased Amount" as $500,400.00. *Id.* at p.1.

100.     According to the CloudFund Agreements, the Purchased Amount would be debited by CloudFund from Jambys's designated bank account in daily increments per business day. The CloudFund Agreements refer to the daily debits as the "Remittance Amount."

101.     The January CloudFund Agreement states that the "Remittance Amount" is "a good faith approximation of" 5% of Jambys's "Future Receipts," resulting in debits of $1,615.00 per business day. Ex. E, p. 1 and § 1(i).

102.    The July CloudFund Agreement states that the "Remittance Amount" is "a good faith approximation of" 8% of Jambys's "Future Receipts," resulting in debits of $2,275.00 per business day. Ex. F, p. 1 and § 1(i).

103.    The November CloudFund Agreement states that the "Remittance Amount" is "a good faith approximation of" 13% of Jambys's "Future Receipts," resulting in debits of $3,800.00 per business day. Ex. G, p. 1 and § 1(i).

104.    The CloudFund Agreements expressly state that Jambys "is selling a portion of a future revenue stream to [CloudFund] at a discount, not borrowing money from [CloudFund]." Exs. E, F, G § 14(a). Despite this, the CloudFund Agreements act as loans in that they provide Jambys with funding in exchange for payments resulting in a repayment amount (*i.e.*, principal plus interest), higher than the amount funded (*i.e.*, principal).

105.    Although the CloudFund Agreements claim that the Remittance Amount is based on the percentage of revenue collected by Jambys, the Remittance Amount is completely disconnected from any fluctuations in Jambys's revenue. The Remittance Amount is not altered simply because Jambys's revenue changes and is in fact completely up to CloudFund's sole discretion.

106.    The CloudFund Agreements purport to provide a mechanism for adjusting the daily Remittance Amount. *See id.* §§ 12, 13. However, it is impossible to utilize it because it only allows adjustment if no Event of Default has occurred, which includes multiple rejected debits made on the designated account, any changes to the account information, the violation of any provision at all in the CloudFund Agreements, and a slew of other items. *Id.* §§ 12(a), 25. Similarly, the CloudFund Agreements also purport to allow reconciliation of the Remittance Amount, but only in the absence of a default. *See id.* §§ 10, 11. In other words, if Jambys does not have enough funds

in its account to cover the daily Remittance Amount, it is not permitted to seek an adjustment to or reconciliation of the daily Remittance Amount. Thus, the CloudFund Agreements render it virtually impossible to obtain a change in the daily remittance even with an actual change in revenue, despite being characterized as a "future receipts sale and purchase agreement." In reality, the CloudFund Agreements are usurious loans cloaked as a purchase of revenue.

107.    The dollar amount of interest earned by CloudFund pursuant to the CloudFund Agreement may be determined by calculating the difference between the "Purchased Amount" and the "Purchase Price" and then dividing that number by the Purchase Price.

108.    Under the January CloudFund Agreement, the dollar amount of interest earned by CloudFund in dollars is $74,850 ($224,850.00 minus $150,000.00) over the loan term of approximately 139 daily Remittances.

109.    Utilizing the New York Attorney General's interest calculation formula of (A/P)/(T/M), the annual interest rate of the January CloudFund Agreement is *at least* **89.96**%. That is more than triple the maximum of 25% permitted by New York's criminal usury statute.

110.    Under the July CloudFund Agreement, the dollar amount of interest earned by CloudFund in dollars is $103,740.00 ($363,740.00 minus $260,000.00) over the loan term of approximately 160 daily Remittances.

111.    Utilizing the New York Attorney General's interest calculation formula of (A/P)/(T/M), the annual interest rate of the July CloudFund Agreement is *at least* **62.64%**. That is more than double the maximum of 25% permitted by New York's criminal usury statute.[6]

---

[6] When factoring in the additional "fees" for each CloudFund Agreement (which appear to be calculated as a set percentage of the loan principal), the interest rate calculations grow even larger and more usurious. Moreover, considering that each subsequent CloudFund Agreement consolidated the remaining unpaid principal of the preceding loan, it is clear that CloudFund was double-dipping with these fee calculations.

112. Under the November CloudFund Agreement, the dollar amount of interest earned by CloudFund in dollars is $140,400.00 ($500,400.00 minus $360,000.00) over the loan term of approximately 132 daily Remittances.

113. Utilizing the New York Attorney General's interest calculation formula of **(A/P)/(T/M)**, the annual interest rate of the November CloudFund Agreement is *at least* **74.34**%. That is nearly triple the maximum of 25% permitted by New York's criminal usury statute.

114. The CloudFund Agreements are designed to ensure that CloudFund will be repaid in full – no matter what changes occur in Jambys's revenue – by purporting to include personal guarantees executed by the Jambys Officers. *See* Exs. E, F, G § 20. The CloudFund Agreements provide that upon any Event of Default, CloudFund may seek immediate payment of all amounts due by Jambys from both Jambys and the Jambys Officers, including, but not limited to, all of CloudFund's costs in connection with Jambys's default. This includes all reasonable expenses and attorneys' fees.

115. The CloudFund Agreements also ensure that CloudFund will be paid by purportedly granting CloudFund with a security interest, under the Uniform Commercial Code, in all of "Future Receipts" in Jambys, as that term is defined in the CloudFund Agreements. *Id.* § 20.

116. As noted above, Jambys, Inc. is a Delaware corporation. Under sections 9-301 and 9-307(e) of Delaware's enacted Uniform Commercial Code, a creditor is required to file a UCC-1 financing statement in the company's state of incorporation, which for Jambys, Inc. is Delaware. *See* DEL. CODE. ANN. tit. 6, §§ 9-301; 9-307(e). *See also* Ex. L (showing no Delaware UCC-1 filings by CloudFund). As CloudFund failed to file a UCC-1 financing statement in the correct jurisdiction, it is thus unsecured. Upon information and belief, CloudFund filed a UCC-1 financing statement in New York, which is wholly ineffective against the Debtors.

117.    Upon Jambys's execution of the January CloudFund Agreement, CloudFund provided Jambys with $142,424.00 in additional funding and began debiting Jambys's bank account at $1,615.00 per business day, as set forth in the January CloudFund Agreement.

118.    When Jambys required additional funding later in the year, CloudFund agreed to consolidate the remaining balance under the July CloudFund Agreement.

119.    Upon Jambys's execution of the July CloudFund Agreement, CloudFund provided Jambys with $193,340.00 in additional funding and began debiting Jambys's bank account at $2,275.00 per business day, as set forth in the July CloudFund Agreement.

120.    When Jambys again required additional funding, CloudFund again agreed to consolidate the remaining balance under the November CloudFund Agreement.

121.    Upon Jambys's execution of the November CloudFund Agreement, CloudFund provided Jambys with $202,170.00 in additional funding and began debiting Jambys's bank account at $3,600.00 per business day, as set forth in the November CloudFund Agreement.

122.    In early 2024, Jambys informed CloudFund that it did not have sufficient funds for the daily debits, and CloudFund and Jambys negotiated a payment schedule that allowed for some delayed payments. Jambys later missed additional payments due to a significant reduction in revenue.

123.    On March 19, 2024, Jambys received an email from CloudFund customer service, informing Jambys that Delta Bridge will be servicing the November CloudFund Agreement going forward. Prior to that, the loans had been serviced by Max Recovery Group.

124.    Upon information and belief, Max Recovery Group is owned by the owner and co-founder of Delta Bridge. Upon information and belief, CloudFund is the same entity as Delta Bridge, which is a subject of the New York Attorney General's investigation into similar funding

agreements and a defendant named in the NYAG Complaint alleging that these funding agreements are usurious loans prohibited by New York law.  *See* NYAG Complaint.

125.    On or around March 13, 2024, attorneys for CloudFund notified Amazon.com and Stripe, Inc. that it had filed a UCC-1 financing statement with the Secretary of State with respect to amounts owed by Jambys under the CloudFund Agreements. This was a problem for Jambys because much of Jambys's revenue comes from these entities. Jambys reached out to CloudFund and agreed to make a payment.

126.    On March 25, 2024, after receiving a payment, CloudFund's counsel notified Amazon.com and Stripe, Inc., that it could release all funds restrained by the lien.

127.    Thereafter, CloudFund's counsel demanded that Jambys sign an agreement, with a new payment plan, indicating that Jambys would not contest the validity of the CloudFund Agreements. Jambys did not sign the agreement.

128.    On April 11, 2024, upon information and belief, CloudFund's counsel again notified Amazon.com and Stripe, Inc., that it had a lien on all funds payable to Jambys pursuant to § 9-406(a) of the Uniform Commercial Code.

129.    On April 22, 2024, Jambys received notice from Amazon.com's counsel that there was a hold on any disbursement of the funds contained in Jambys's account as a result of, *inter alia*, a purported UCC-1 lien asserted by CloudFund.  As noted above, the UCC-1 financing statement was filed in New York, and CloudFund had no basis in fact or law to assert a lien on the Debtors' assets held by Amazon.  On or around May 7, 2024, or one week after the Petition Date, Jambys was able to secure a release of the hold on its Amazon account by demonstrating that CloudFund had failed to properly perfect its security interest.

130.    To date, Jambys's records show it has paid approximately a total of $552,079.00 to CloudFund, against CloudFund's total "face value" initial funding of $770,000; total "actual funding"[7] of $537,934.00; and a total repayment obligation[8] of $894,679.00.

### D.    The MCA Servicing Agreements

131.    On or about August 24, 2023, Jambys signed the August MCA Servicing Agreement which is entitled "Revenue Purchase Agreement." *See generally* Ex. H.

132.    Similarly, on or about October 5, 2023, Jambys signed the MCA Servicing Agreement which is entitled "Revenue Purchase Agreement." *See generally* Ex. I.

133.    Neither Simmons Capital's nor MCA Servicing's signature appear anywhere in the MCA Servicing Agreements. *See generally* Exs. H and I.

134.    MCA Servicing agreed to provide Jambys with $125,000.00 in funds pursuant to the August MCA Servicing Agreement and $70,000.00 in funds pursuant to the October MCA Servicing Agreement. Exs. H and I, at p.1.

135.    In exchange, Jambys purportedly agreed to sell to MCA Servicing, a percentage of all of Jambys's "payments, receipts, settlements and funds paid to or received" by Jambys "in payment or settlement of [Jambys's] existing and future accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from [Jambys's] customers and/or payors or obligors" until the "Purchased Amount" identified in each of the MCA Servicing Agreements is paid in full. *Id.* The August MCA Servicing Agreement identifies the "Purchased Amount" as $181,250.00 and the October MCA Servicing Agreement identifies the "Purchased Amount" as $104,300.00. *Id.*

---

[7]    Calculated as "Face Value", net of lender fees and previously consolidated loan balances.

[8]    Calculated as the total "Purchased Amounts" of the CloudFund Agreements, net of remaining balances from January and July CloudFund Agreements.

136.    According to the MCA Servicing Agreements, the Purchased Amount would be debited by MCA Servicing from Jambys's designated account in daily increments per business day and MCA Servicing may collect twice the amount on any date following a United States banking holiday. *Id.* The daily increments debited by MCA Servicing are defined in the MCA Servicing Agreement as the daily "Remittance," which the MCA Servicing Agreements claim is a "good faith estimate" of "MCA's share of future revenue stream." *Id.*

137.    The Remittance under the August MCA Servicing Agreement is identified as $1,813.00. Ex. H at p.1. The Remittance under the October MCA Servicing Agreement is identified as $1,043.00. Ex. I at p.1.

138.    The MCA Servicing Agreements expressly state that Jambys "is selling a portion of a future revenue stream to MCA at a discount, and is not borrowing money from MCA, therefore there is no interest rate or payment schedule and no time by which the Purchased Amount must be collected by MCA." Exs. H and I, at p.1. Despite this, the MCA Servicing Agreements behaved as loans in that they provided Jambys with funding in exchange for payments resulting in a repayment amount (*i.e.,* principal plus interest), higher than the amount funded (*i.e.,* principal).

139.    Although the MCA Servicing Agreements claim that the daily Remittance is based on Jambys's future revenue stream, the Remittance is completely disconnected from any fluctuations in Jambys's revenue. The Remittance amount is not altered simply because Jambys's revenue changes and is in fact completely up to MCA Servicing's sole discretion.

140.    The MCA Servicing Agreements purport to provide a mechanism for adjusting the amount of the Remittance. *See id.* §1.4. However, it is impossible to utilize it because it only allows adjustment if no Event of Default has occurred, which includes not having sufficient funds in the designated account, any notification by Jambys that it intends to breach the agreements by not

making the daily debits or otherwise, changes being made to the designated account's login information, the maintenance of other bank accounts without MCA Servicing's consent, and a slew of other items. *Id.* §§ 1.4, 3.1.

141.    Similarly, the MCA Servicing Agreements also purport to allow for reconciliation of the Remittance, but only in the absence of a default. *Id.* § 1.3. In other words, if Jambys does not have enough funds in its account to cover the daily Remittance, it is not permitted to seek an adjustment or reconciliation to the daily Remittance. Thus, the MCA Servicing Agreements render it virtually impossible to obtain a change in the daily remittance even with an actual change in revenue, despite being characterized as a "revenue purchase agreement." In reality, the MCA Servicing Agreement are usurious loans, cloaked as a purchase of revenue.

142.    The dollar amount of interest earned by MCA Servicing pursuant to the MCA Servicing Agreements may be determined by calculating the difference between the "Purchased Amount" and the "Purchase Price" and then dividing that number by the "Purchase Price."

143.    Under the August MCA Servicing Agreement, the dollar amount of interest earned by MCA Servicing in dollars is $56,250 ($181,250.00 minus $125,000.00) over the loan term of approximately 100 daily Remittances.

144.    Utilizing the New York Attorney General's interest calculation formula of **(A/P)/(T/M)**, the annual interest rate of the August MCA Servicing Agreement is *at least* **112.98%**. That is more than four times the maximum of 25% permitted by New York's criminal usury statute.

145.    Under the October MCA Servicing Agreement, the dollar amount of interest earned by MCA Servicing in dollars is $34,300 ($104,300.00 minus $70,000) over the loan term of approximately 107 daily Remittances.

146.    Utilizing the New York Attorney General's interest calculation formula of **(A/P)/(T/M)**, the annual interest rate of the October MCA Servicing Agreement is *at least* **138.83**%. That is more than five times the maximum of 25% permitted by New York's criminal usury statute.

147.    The MCA Servicing Agreements are designed to ensure that MCA Servicing will be repaid in full – no matter what changes occur in Jambys's revenue – by including personal guarantees executed by the Jambys Officers. *See* Exs. H and I at p.6 and § 3.2. The MCA Servicing Agreements provide that upon any Event of Default, MCA Servicing may seek immediate payment of all amounts due by Jambys from the Jambys Officers, including, but not limited to, all losses and damages incurred by MCA Servicing in enforcing the MCA Servicing Agreements. *Id.* This includes all expenses and attorneys' fees incurred by MCA Servicing in connection with the enforcement of the MCA Servicing Agreements. *Id.*

148.    The MCA Servicing Agreements also ensure that MCA Servicing will be paid by purportedly granting MCA Servicing with a security interest, under the Uniform Commercial Code, in all of Jambys's assets, including, but not limited to, "all accounts, chatter, documents, equipment, general intangibles, instruments and inventory," "all proceeds," "all funds at any time in [Jambys' or Jambys Officers'] accounts," "present and future electronic check transactions," and "any amount which may be due to MCA under the [MCA Servicing Agreements]." *Id.* at p.5.

149.    Upon Jambys's execution of the August and October MCA Servicing Agreements, MCA Servicing provided Jambys with $117,450.00 and $62,950.00 in respective funding (after accounting for fees) and began debiting Jambys's bank account in accordance with the MCA Servicing Agreements.

150.    To date, Jambys's records indicate it has paid a total of $275,203.00 toward the MCA Servicing Agreements.

151.    The MCA Servicing Agreements provided a total of $195,000.00 in face value principal funding (*i.e.*, before deduction of fees), and required a total repayment obligation of $285,550.00.

152.    On April 25, 2024, MCA Servicing filed a Complaint (the "<u>MCA Servicing Action</u>") in the Supreme Court of the State of New York, Kings County, against Jambys and the Jambys Officers seeking to recover a total of $17,940.10 under the October MCA Servicing Agreement and related Guaranty. According to MCA Servicing's Complaint, there is a $10,927.00 receivable due under the October MCA Servicing Agreement, plus MCA Servicing is seeking $735.00 in "NSF fees," $3,000 in default fees, plus $3,278.10. in attorneys' fees.

153.    On or about May 11, 2024, Mr. Goble found a copy of MCA Servicing's Complaint taped to his apartment door. Although it appears that MCA Servicing is attempting to serve its Complaint, as of today's date, service has not been completed.

154.    On or about June 1, 2024, despite the fact that Jambys had served MCA Servicing with the Court's May 10, 2024 TRO [Adv. D.I. 16] and May 23, 2024 P.I. Order [Adv. D.I. 25] and had further filed an updated suggestion of bankruptcy in the MCA Servicing Action, MCA Servicing continued its endeavors and served its Complaint on Mr. Ambrose's fiancée at his home. Upon learning of this incident, on June 4, 2024, counsel for Jambys advised Ariel Bouskila, who represents MCA Servicing in the MCA Servicing Action, that Jambys considers this as well as any further such actions to be clear violations of the automatic stay and the Court's P.I. Order. Mr. Bouskila has since acknowledged the mistake and made assurances that no further attempts at service would be made.

E.     **NewCo Agreement**

155.    Simmons Capital, which brokered the Velocity Agreement, United First Agreement, the CloudFund Agreements, and the MCA Servicing Agreements, also brokered the NewCo Agreement entitled "Revenue Purchase Agreement" dated January 26, 2023. *See generally* Ex. J.

156.    While the lender identified in the NewCo Agreement is NewCo, the agreement is emblazoned with the Simmons Capital letterhead on every page. *Id.* In contrast, the other MCA Agreements brokered by Simmons Capital utilized the letterheads of their respective lenders.

157.    Neither NewCo's nor Simmons Capital's signature appears anywhere in the NewCo Agreement. *See generally* Ex. J.

158.    NewCo agreed to provide Jambys with $100,000.00 in funds pursuant to the NewCo Agreement. Ex. J, at p.1.

159.    In exchange, Jambys purportedly agreed to sell a percentage of all of Jambys's "payments, receipts, settlements and funds paid to or received" by Jambys "in payment or settlement of [Jambys's] existing and future accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from [Jambys's] customers and/or payors or obligors" until the "Purchased Amount" of $142,000.00 was paid in full. *Id.*

160.    According to the NewCo Agreement, the Purchased Amount would be debited by NewCo from Jambys's designated account in daily increments per business day and NewCo may collect twice the amount on any date following a United States banking holiday. *Id.* The daily increments debited by NewCo are defined in the NewCo Agreement as the daily "Remittance,"

which the NewCo Agreement claims is a "good faith estimate" of "NewCo's share of future revenue stream." *Id.*

161.    The Remittance under the NewCo Agreement is identified as $1,184.00. Ex. J at p.1.

162.    The NewCo Agreement expressly states that Jambys "is selling a portion of a future revenue stream to [NewCo] at a discount, and is not borrowing money from [NewCo], therefore there is no interest rate or payment schedule and no time by which the Purchased Amount must be collected by [NewCo]." Ex. J, at p.1.  Despite this, the NewCo Agreement behaved as a loan in that it provided Jambys with funding in exchange for payments resulting in a repayment amount (*i.e.,* principal plus interest), higher than the amount funded (*i.e.,* principal).

163.    Although the NewCo Agreement claims that the daily Remittance is based on Jambys's future revenue stream, the Remittance is completely disconnected from any fluctuations in Jambys's revenue. The Remittance amount is not altered simply because Jambys's revenue changes and is in fact completely up to NewCo's sole discretion.

164.    The NewCo Agreement purports to provide a mechanism for adjusting the amount of the Remittance. *See id.* §1.4. However, it is impossible to utilize it because it only allows adjustment if no Event of Default has occurred, which includes not having sufficient funds in the designated account, any notification by Jambys that it intends to breach the agreements by not making the daily debits or otherwise, changes being made to the designated account's login information, the maintenance of other bank accounts without NewCo's consent, and a slew of other items. *Id.* §§ 1.4, 3.1. Similarly, the NewCo Agreement also purports to allow for reconciliation of the Remittance, but only in the absence of a default. *Id.* § 1.3. In other words, if Jambys does not have enough funds in its account to cover the daily Remittance, it is not permitted

to seek an adjustment or reconciliation to the daily Remittance. Thus, the NewCo Agreement renders it virtually impossible to obtain a change in the daily remittance even with an actual change in revenue, despite being characterized as a "revenue purchase agreement." In reality, the NewCo Agreement is a usurious loan, cloaked as a purchase of revenue.

165.    The dollar amount of interest earned by NewCo pursuant to the NewCo Agreement may be determined by calculating the difference between the "Purchased Amount" and the "Purchase Price" and then dividing that number by the "Purchase Price."

166.    Under the NewCo Agreement, the dollar amount of interest earned by NewCo in dollars is $42,000.00 ($142,000.00 minus $100,000.00) over the loan term of approximately 120 daily Remittances.

167.    Utilizing the New York Attorney General's interest calculation formula of **(A/P)/(T/M)**, the annual interest rate of the NewCo Agreement is *at least* **87.90**%. That is more than three times the maximum of 25% permitted by New York's criminal usury statute.

168.    The NewCo Agreement was designed to ensure that NewCo would be repaid in full – no matter what changes occur in Jambys's revenue – by including personal guarantees executed by the Jambys Officers. *See* Ex. J at p.6 and § 3.2. The NewCo Agreement provided that upon any Event of Default, NewCo could seek immediate payment of all amounts due by Jambys from the Jambys Officers, including, but not limited to, all losses and damages incurred by NewCo in enforcing the NewCo Agreement. *Id.* This included all expenses and attorneys' fees incurred by NewCo in connection with the enforcement of the MCA Servicing Agreements. *Id.*

169.    The NewCo Agreement also ensured that NewCo would be paid by purportedly granting NewCo with a security interest, under the Uniform Commercial Code, in all of Jambys's assets, including, but not limited to, "all accounts, chatter, documents, equipment, general

intangibles, instruments and inventory," "all proceeds," "all funds at any time in [Jambys' or Jambys Officers'] accounts," "present and future electronic check transactions," and "any amount which may be due to NewCo under the [NewCo Agreement]." *Id.* at p.5.

170.  Upon Jambys's execution of the NewCo Agreement, NewCo provided Jambys with $142,000.00 in funding (after accounting for fees) and began debiting Jambys's bank account in accordance with the NewCo Agreement.

171.  On or about July 20, 2023, Jambys completed its payments under the NewCo Agreement.

**F.  SellersFi Agreement**

172.  On or about January 17, 2024, Jambys signed the SellersFi Agreement. Unlike the MCA Agreements discussed above, the SellersFi Agreement is titled as a loan agreement. *See generally* Ex. K.

173.  Additionally, unlike the MCA Agreements, the SellersFi Agreement is transparently structured as the provision of a principal loan of $250,000 in exchange for repayment thereof over the course of thirty-six bi-weekly terms (approximately one-and-a-half years) with an annual interest rate of 21%. *Id.* at p. 1.

174.  Like the MCA Agreements, the SellersFi Agreement requires that the Jambys Officers act as personal guarantors of Jambys's liability under the agreement. *Id.* §§ 5.1 – 5.5.

175.  The SellersFi Agreement also provides SellersFi with a security interest, under the Uniform Commercial Code, in a laundry list of nearly all of Jambys's assets, including but not limited to its receivables, commercial papers, equipment, and inventory. *Id.* § 1.10.

176.  SellersFi timely filed a UCC-1 financing statement in Delaware on January 22, 2024. *See* Ex. L.

177.    To date, the Debtors' records show they have repaid approximately $40,222.60 toward their obligations under the SellersFi Agreement.

## II.    The MCA Agreements Are Usurious Loans

178.    Despite the MCA Lenders' attempts to characterize the MCA Agreements as purchases of revenue or future receipts, the MCA Agreements are usurious loans prohibited by New York law.

179.    The MCA Lenders did not take on the benefits and risks of ownership under the MCA Agreements, which occur with any purchase. The MCA Agreements provide that a specific sum will be paid to the MCA Lenders over time, irrespective of how Jambys's business is performing. Indeed, the estimated "revenue" on which the daily remittance amounts were determined had no connection whatsoever to the actual revenue being earned by Jambys at the time it signed the MCA Agreements. As set forth below, the characteristics of these "purchases" demonstrate that the MCA Agreements were not purchases or revenue at all, but loans disguised as purchases in order to avoid New York's prohibition on usurious interest rates.

180.    New York courts consider the following factors in determining whether a cash advance or purchase of revenue is in fact a loan: (1) "the discretionary nature of the reconciliation provisions"; (2) "allegations that defendants refused to permit reconciliation"; (3) "the selection of daily payment rates that did not appear to represent a good faith estimate of receivables"; (4) "provisions making rejection of an automated debit on two or three occasions without prior notice an event of default entitling defendants to immediate repayment of the full uncollected purchase amount;" and (5) "provisions authorizing defendants to collect on the personal guaranty in the event of plaintiff's inability to pay or bankruptcy." *Davis v. Richmond Cap. Grp.,* 194 A.D.3d 516, 517 (1st Dep't 2021).

181.    As described above, it was completely up to the MCA Lenders' sole discretion whether to utilize the reconciliation and adjustment provisions in the MCA Agreements. In fact, Jambys's inability or failure to make certain payments disqualified Jambys from being able to invoke those provisions.

182.    The daily amounts debited from Jambys's account were in no way tied to Jambys's actual revenue that the MCA Lenders were supposedly purchasing.

183.    For example, in August 2023, Jambys entered into MCA Agreements with Velocity, United First, and MCA Servicing, and each agreement presumes vastly different revenue amounts despite being executed in the same month. As explained above, the daily remittances supposedly constitute a percentage of Jambys's revenue, as determined by the MCA Lenders, divided among the number of business days in each month.

184.    The Velocity Agreement, executed August 9, 2023, provides for a daily Remittance of $999 per business day, supposedly constituting 20% of Jambys's estimated future receipts. *See* Ex. C.

185.    The United First Agreement, executed August 24, 2023, provides for a daily remittance of $2,779 per business day, supposedly constituting 11% of Jambys's estimated future receipts. *See* Ex. H.  This is $1,780 more per day than the daily Remittance under the Velocity Agreement despite the fact that the Velocity Agreement provided for a higher percentage of revenue.

186.    The MCA Servicing August Agreement, also executed August 24, 2023, provides for a daily Remittance of $1,813 per business day, supposedly constituting 10% of Jambys's estimated future receipts. *See* Ex. H. Again, the daily Remittance under the MCA Servicing August Agreement is significantly *higher* than the Remittance under the Velocity Agreement despite the

higher percentage indicated in the Velocity Agreement, while being significantly *lower* than the United First daily Remittance despite the specified percentages being relatively similar. Given that each of these MCA Lenders were provided the same bank statements to review for the loan approval process, there is no way to reconcile the massive disparities.

187.     Rather, it is apparent that each of these MCA Agreements set arbitrary numbers based on each individual MCA Lender's whims, and that the Purchased Percentages never had any accurate basis in the financial statements provided by Jambys for seeking such loans.

188.     Further, although some of the MCA Lenders negotiated new payment schedules with Jambys, those schedules were never tied to the actual revenue being earned by Jambys. Rather, the schedules were aimed towards ensuring that the "purchased" amount was paid in full within a time frame required by the MCA Lenders.

189.     The MCA Agreements were subject to specified term lengths, that being the amount of time that it would take to pay off the amounts "purchased" by Defendants based on the daily debits. The length of the transactions did not vary based on fluctuations in Jambys's revenue.

190.     The MCA Agreements identified the failure to make the required payments as a default, disqualifying Jambys from being able to seek reconciliation of or adjustments to the payment amounts and requiring the immediate repayment of the full amount.

191.     Further, the MCA Agreements ensured that the MCA Lenders would be able to recover the full amount due despite changes in Jambys's revenue by requiring personal guarantees of the Jambys Officers.

192.     While the wordings of the guarantees vary slightly, they each require complete and immediate payment of the full amount allegedly "purchased" by the MCA Lenders, including any accrued fees, as well as attorneys' fees and expenses incurred by the MCA Lenders as a result of

Jambys's default. This is a quintessential feature of a loan and is in no way connected to the amount of Jambys's actual revenue.

193.    The MCA Agreements provide exception to the MCA Lenders' right to repayment even in the event of Jambys's insolvency or bankruptcy, further demonstrating that they are loans and not purchases of revenue.

194.    The MCA Agreements also purport to provide the MCA Lenders with a security interest under Article 9 of the Uniform Commercial Code. These secured interests ensure that the MCA Lenders' claims for payment receive priority in the event of a Jambys bankruptcy.

195.    The interest rate of these loans far exceeds the maximum criminal rates permitted under New York law. The loans are therefore illegal, criminally usurious, and void *ab initio*.

## <u>COUNT ONE</u>

### (Extension of the Automatic Stay to Enjoin The Loan Actions Against the Jambys Officers – Against All Defendants Except NewCo)

196.    Jambys repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

197.    Jambys seeks an injunction to stay all prosecution and/or enforcement of the Loan Actions against the Jambys Officers under Sections 105(a) and 362(a) of the Bankruptcy Code until its expiration under the terms of Debtors' plan of reorganization.

198.    Bankruptcy Code § 362(a)(1) stays the commencement or continuation of any action or proceeding against a debtor. Although the stay applies to debtors, court may extend the stay under Bankruptcy Code § 362 to non-debtors in order to uphold the integrity of the debtor's estate and provide the debtor with the full protections of the automatic stay. A bankruptcy court may extend the automatic stay to a non-debtor if the debtor and non-debtor share an identity of

interest such that a suit against the non-debtor is essentially a suit against the debtor, or where the action against the non-debtor will have an adverse impact on the debtor's reorganization.

199.    Under section 105(a), the Bankruptcy Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." This Court may enjoin actions against third parties where necessary to preserve the Debtors' restructuring efforts, including by fully effectuating the protections of the automatic stay under section 362(a). Such relief is particularly appropriate here, where it is necessary to protect Jambys's ability to successfully navigate the restructuring process, and negotiating and confirming a chapter 11 plan. The Court may, therefore, issue an injunction under section 105(a) to stay the Loan Actions.

200.    A stay extension is warranted under both of these standards, each of which independently justifies the relief requested herein. As discussed in more detail in the Stay Extension Brief filed contemporaneously herewith, absent an order enjoining the Loan Actions, Jambys will suffer immediate and irreparable harm that will threaten the integrity of these bankruptcy proceedings.

201.    First, because the Loan Actions all involve substantially the same allegations and issues pertaining to guarantees provided by the Jambys Officers, any judicial determination against the Jambys Officers under such guarantees will raise significant collateral estoppel concerns and potential evidentiary prejudice to the Debtors should the Debtors fail to participate in the MCA Actions. Second, by way of Jambys's corporate articles and bylaws, the Debtors and their estates have indemnification obligations to the Defendants requiring Jambys to pay costs and expenses incurred in connection with liabilities incurred by the Jambys Officers in their capacities as directors, officers, or agents of Jambys. Third, if the MCA Actions are permitted to proceed, any

judgment against the Jambys Officers would require a finding that the MCA Agreements are enforceable, which would effectively be a judgment that they are enforceable against the Debtors, thus affecting the Debtors' estates and threatening the recovery of creditors. Fourth, the threat that an adverse judgment will subsequently be used against the Debtors will compel the Debtors to participate in the Loan Actions in order to protect the Debtors' interests, including by the efforts necessary to prepare for and attend hearings, to assist in preparing pleadings and discovery responses, to spend time preparing for and participating in depositions, and to help analyze and develop legal defenses. Those efforts will distract the Debtors from the restructuring process and require them to divert resources away from the effort to consummate a successful chapter 11 plan.

202.     The balance of the harms and the public interest weighs in favor of enjoining all of the Loan Actions. The Defendants will not be harmed by the requested injunctive relief.

## COUNT TWO

### (Declaratory Judgment That The MCA Agreements Are Criminally Usurious and Thus Void Under New York Penal Law § 190.40 – Against the MCA Lenders)

203.     Jambys repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

204.     A transaction cloaked as a purchase of future revenues or receipts may constitute a usurious loan prohibited by New York law.

205.     Despite their titles, the MCA Agreements do not constitute purchase agreements, but rather, are loans obligating Jambys to repay funds provided by the MCA Lenders with accrued interest.

206.     The interest rates of the loans issued under the MCA Agreements far exceed 25% per annum, which is the maximum interest rate permitted under New York criminal usury law. The MCA Agreements, therefore, are illegal usurious loans prohibited by New York law.

207.    By making such loans, the MCA Lenders intended to impose and collect interest in excess of 25% of their respective loan principals.

208.    Usurious loans are void and unenforceable under New York law, rendering both the principal and interest uncollectible. *Adar Bays, LLC v. Gene SYS ID, Inc.,* 37 N.Y.3d 320, 332-33 (2021); *see also* N.Y. Penal Law § 190.40.

209.    Despite this, the MCA Lenders have taken coercive actions seeking to enforce the payment obligations allegedly imposed on Jambys pursuant to the MCA Agreements, including, but not limited to, making demands for payments, filing suit against Jambys and the Jambys Officers, and/or imposing liens on Jambys's business accounts.

210.    An actual and justiciable controversy therefore exists between Debtors and the MCA Lenders about whether the MCA Agreements are enforceable purchase agreements or usurious loans prohibited by New York law.

211.    Accordingly, Jambys seeks and is entitled to a judgment declaring that the MCA Agreements are usurious loans prohibited by New York law, directing the MCA Lenders to cease all collection efforts under the MCA Agreements, and ordering the MCA Lenders to return to Jambys all principal and interest payments made pursuant to the MCA Agreements.

## COUNT THREE

### (Declaratory Judgment That Any Liens Filed Pursuant To The MCA Agreements Are Void and Have No Priority – Against the MCA Lenders)

212.    Jambys repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

213.    The Court's determination of the validity, priority, or extent of a creditor's liens asserted against property of the estate is a core proceeding under 11 U.S.C. § 157(b)(2)(k).

214.    The Court may declare the rights of any interested party seeking the declaration, and the declaration shall have the force and effect of a final judgment. 28 U.S.C. § 2201(a).

215.    Pursuant to Rule 7001(2) of the Federal Rules of Bankruptcy Procedure, the Court may entertain a declaration action to determine the validity, priority, or extent of a lien or other interest in property of the estate.

216.    Certain of the MCA Lenders have filed UCC-1 liens against Debtors arising from Jambys' failure to make certain payments under the MCA Agreements.

217.    As demonstrated herein, the MCA Agreements are usurious loans, and therefore, void and unenforceable under New York law.

218.    Therefore, there is no debt upon which the UCC-1 security interest may attach.

219.    Moreover, as discussed above, the MCA Actions taken in furtherance of the liens filed by Velocity, United First, and CloudFund had no basis in law or fact.  Nonetheless, those MCA Lenders' actions in asserting these baseless liens caused significant confusion to the Debtors' vendors and payment processing partners, which in turn caused prejudice to the Debtors and their business, meaningfully interfered with the Debtors' operations and ongoing restructuring efforts, and significantly hastened the Debtors' need to seek relief under chapter 11 sooner than envisioned.

220.    The declaratory judgment sought by Jambys is not duplicative of other matters to be resolved as part of the claims in this action. The Court's resolution of these issues at the outset of this action is necessary to the Court's determination of the remaining claims brought herein.

221.    Accordingly, a judicial determination and declaration are therefore necessary to declare that the MCA Lenders do not have a secured interest in any collateral.

## COUNT FOUR

**(Constructive Fraudulent Transfers Pursuant to
11 U.S.C. § 548(a)(1)(B) – Against the MCA Lenders)**

222.    Jambys repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

223.    A debtor may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtors, that was made or incurred on or within two years before the petition date if the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation; and, inter alia, the debtor was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

224.    Jambys seeks to avoid the transfers made to the MCA Lenders within the last two years (the "Fraudulent Transfers") and to recover the value thereof from the MCA Lenders. Attached hereto as **Exhibit N** is a list of the Debtors' bank transactions with the MCA Lenders during the two years prior to the Petition Date, which were pursuant to the MCA Agreements attached as **Exhibits C through K**.

225.    Each of the Fraudulent Transfers was a transfer within the meaning of 11 U.S.C. § 101(54).

226.    Each of the Fraudulent Transfers was a transfer of property, or of an interest in property, of the Debtors to and/or for the benefit of the MCA Lenders.

227.    Each of the Fraudulent Transfers was made at a time when the Debtors were insolvent or were rendered insolvent by the transfer.

228.    The Debtors did not receive a reasonably equivalent value in exchange for any of the Fraudulent Transfers.

229.    The MCA Lenders did not take the Fraudulent Transfers in good faith.

230.    Accordingly, the Fraudulent Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B).

## COUNT FIVE

**(Preferential Transfers Pursuant to 11 U.S.C. § 547(b) – Against MCA Lenders)**

231.    Jambys repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

232.    Within ninety (90) days prior to the Petition Date, the Debtors made numerous transfers to or for the benefit of the MCA Lenders ("Preferential Transfers"). Attached hereto as **Exhibit O** is a list of the Debtors' bank transactions with the MCA Lenders during the 90 days prior to the Petition Date.

233.    The Preferential Transfers were made by Debtors and constituted a transfer of an interest in the property of the Debtors.

234.    Defendants were creditors of the Debtors by virtue of the Loan Agreements pursuant to which Debtors were required to make certain payments.

235.    The Preferential Transfers were made to or for the benefit of a creditor within the meaning of 11 U.S.C. § 547(b)(1) because the Preferential Transfers either reduced or fully satisfied the debts owed by Debtors to the MCA Lenders.

236.    The Preferential Transfers were made on or within 90 days before the Petition Date.

237.    The Preferential Transfers were made while the Debtors were insolvent.

238.    The Preferential Transfers were each made for, or on account of, an antecedent debt or debts owed by the Debtors to the Defendants before such transfers were made, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) prior to being paid by Debtors.

239.    As a result of the Preferential Transfers, the Defendants received more than they would have received if: (i) the chapter 11 cases were under chapter 7 of the Bankruptcy Code; (ii) the Preferential Transfers had not been made; and (iii) the Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

240.    Accordingly, the Preferential Transfers are avoidable pursuant to section 547(b) of the Bankruptcy Code.

## COUNT SIX

### (Recovery of Avoidable Transfers – Against the MCA Lenders)

241.    Jambys repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

242.    The Debtors made the Fraudulent Transfers and the Preferential Transfers to or for the benefit of the Defendants.

243.    The Defendants are the initial transferees or the immediate, mediate, or subsequent transferees of the Fraudulent Transfers and Preferential Transfers.

244.    The Debtors may recover, and intend to recover, the Fraudulent Transfers and the Preferential Transfers and the benefits therefrom from any and all mediate, immediate, and subsequent transferees.

## COUNT SEVEN

### (Unjust Enrichment – Against the MCA Lenders)

245.    Jambys repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

246.    The Debtors provided the MCA Lenders with numerous payments pursuant to the MCA Agreements, which are void *ab initio* as criminally usurious and against public policy.

49

247.     As a result thereof, the MCA Lenders each realized a material benefit to the detriment of the Debtors.

248.     It would be against equity and good conscience to permit the MCA Lenders to retain the benefit of the payments of the usurious loans.

249.     Accordingly, the MCA Lenders have been unjustly enriched at the Debtors' expense.

## COUNT EIGHT

**(Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) (RICO) – Against the MCA RICO Defendants)**

250.     Jambys repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

### A.     Culpable Persons

251.     Each of the MCA Lenders (Velocity, United First, GFE, GFE NY, CloudFund, Delta Bridge, Max Recovery, MCA Servicing, NewCo, and Simmons Capital), as well as Jay Avigdor ("Avigdor"), Boris Musheyev ("Musheyev"), Viacheslav Eliyayev ("Eliyayev"), Bartosz Maczuga ("Maczuga"), Vadim Serebro ("Serebro"), and Matt Simmons ("Simmons") (collectively, the "MCA RICO Defendants") constitute "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that they are entities capable of holding legal interests in property.

252.     The MCA RICO Defendants are organized into four Enterprises here, comprised of MCA funding companies, MCA brokerage companies, and their respective employees. Those Enterprises are comprised as follows:

### i.  The Velocity Enterprise

1. Jay Avigdor

2. Velocity

3. Matt Simmons

4. Simmons Capital

### ii.  The United First Enterprise

1. Boris Musheyev

2. Viacheslav Eliyayev

3. United First

4. GFE

5. GFE NY

6. Matt Simmons

7. Simmons Capital

### iii.  The CloudFund Enterprise

1. Bartosz Maczuga

2. Vadim Serebro

3. CloudFund

4. Delta Bridge

5. Max Recovery

6. Matt Simmons

7. Simmons Capital

### iv.  The NewCo Enterprise

1. NewCo

       **2.**  MCA Servicing

       **3.**  Matt Simmons

       **4.**  Simmons Capital

**B.**    **The Enterprises**

253.    Each of the MCA RICO Defendants has participated in association-in-fact enterprises (the "MCA Enterprises") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

254.    Each of the MCA RICO Defendants has received income derived through the collection of unlawful debts within the meaning of 18 U.S.C. § 1962(c) resulting from criminally usurious loans issued by each MCA Lender, as the principal of its respective association-in-fact enterprise.

255.    Each of the MCA Enterprises organized themselves into a separate cohesive group with specific and assigned responsibilities and an identifiable command structure to operate as a unit to accomplish the common goals and purposes of collecting unlawful debts.

256.    Each respective MCA Enterprise's members have been associated for a substantial period of time, have functioned as a continuing unit, and have been joined in a common purpose.

257.    The development and execution of the MCA Enterprises' members' activities in furtherance of their respective enterprise's purposes would exceed the capability of each member acting singly or without the aid of each other.

258.    Each of the MCA Enterprises is distinct from and has an existence beyond the pattern of racketeering described below.  Upon information and belief, the members associated with and/or employed by each of the MCA Enterprises—either directly or through their employees—also provide legitimate lending services or other services beyond those usurious lending activities described below.

## I.  The Velocity Enterprise

*(Avigdor, Velocity, Simmons, and Simmons Capital)*

259.    Defendant Avigdor is Velocity's chief executive officer.[9] Avigdor's LinkedIn page also indicates that he is the "Founder & CEO" of Velocity and that he has operated in this capacity since at least February 2018.[10]

260.    Defendant Velocity issued the usurious loan under the Velocity Agreement.

261.    Defendant Matt Simmons is an owner and Senior Funding Manager of Simmons Capital Partners.

262.    Defendant Simmons Capital brokered the Velocity Agreement.

263.    Avigdor, Velocity, Simmons, and Simmons Capital constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

264.    Avigdor, Velocity, Simmons, and Simmons Capital are a group of persons that are associated-in-fact for the common purpose of carrying on an ongoing unlawful enterprise (the "Velocity Enterprise"). Specifically, the Velocity Enterprise has the common goal of soliciting, issuing, and servicing criminally usurious loans, and collecting the unlawful debts resulting therefrom.

265.    Upon information and belief, since at least 2023 and continuing through the present, the members of the Velocity Enterprise (*i.e.,* Avigdor, Velocity, Simmons, and Simmons Capital) have had ongoing relations with each other for the purpose of originating, underwriting, and servicing criminally usurious loans to and collecting the resulting unlawful debts from, small businesses throughout the United States, including Jambys.

---

[9] *See* https://www.velocitycg.com/about-us

[10] *See* https://www.linkedin.com/in/jay-avigdor-4b035247/

266.   The criminal usurious loans, including the loan issued under the Velocity Agreement, resulted in unlawful debts within the meaning of 18 U.S.C. § 1962(c) and (d), because they violate applicable criminal usury statutes with interest rates that routinely exceed the legal rate under New York law. Specifically, the annualized rate charged to Jambys under the Velocity Agreement exceeded **80%**, a rate that is more than three times the maximum twenty-five percent (25%) that is permitted to be charged under New York Penal Law § 190.40.

267.   The Velocity Enterprise has further engaged in a pattern of collecting and attempting to collect unlawful debt, by, inter alia, filing enforcement actions against borrowers who have fallen victim to the Velocity Enterprise's schemes. *See, e.g., Velocity Cap. Grp. LLC v. Montecito Fresh Produce Inc.*, Index No. 537774/2022 (N.Y. Sup. Ct. Kings Cnty. Dec. 27, 2022); *Velocity Cap. Grp. LLC v. Mehling Orthopedics LLC.*, Index No. 528718/2022 (N.Y. Sup. Ct. Kings Cnty. Oct. 3, 2022); *Velocity Cap. Grp. LLC v. SK Transport Inc.*, Index No. 527515/2021 (N.Y. Sup. Ct. Kings Cnty. Oct. 27, 2021). Indeed, the Velocity Action is another example.

268.   The Velocity Enterprise is comprised of a non-exhaustive list of members who are associated with and/or employed by the Velocity Enterprise as follows:

### *Jay Avigdor*

269.   As Velocity's founder and CEO, Defendant Avigdor, upon information and belief, has decision-making authority within the Velocity Enterprise, including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, and the ultimate payment terms, amount, and period of each usurious loan, including the loan issued under Velocity Agreement.

270.   Upon information and belief, in his capacity as the leader of Velocity, Avigdor is responsible for promoting Velocity on traditional and social media platforms to raise visibility of

Velocity's financing offerings, and has given many interviews to that end.  For example, Avigdor recently gave an interview on TMCnet.com, a technology news website, to promote how Velocity is purportedly using artificial intelligence in its "small business funding."[11]

271.    Additionally, upon information and belief, Avigdor is also involved in and at least partially responsible for creating, approving, and implementing the policies, practices, and instrumentalities of the Velocity Enterprise to accomplish its common goals and purposes, including: (i) the form of merchant agreements used by the Velocity Enterprise to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Velocity Enterprise's collection of unlawful debts; (ii) the amount and repayment period of the usurious loans extended by the Velocity Enterprise to merchants; and (iii) the method of collecting the daily Remittances via ACH withdrawals. All such forms were used to make and collect upon the criminally usurious loans including, without limitation, the loan extended to Jambys under the Velocity Agreement.

272.    Avigdor also has taken actions and directed other member(s) of the Velocity Enterprise to take actions necessary to accomplish its overall goals and purposes, including personally engaging in and/or directing other member(s) of the Velocity Enterprise to make loans to merchants and to collect upon the unlawful loans.

273.    With respect to the Velocity Agreement, Avigdor: (i) approved the Enterprise's brokerage and entry into the Velocity Agreement and the payment terms thereunder; (ii) authorized the ACH withdrawals used by the Velocity Enterprise to collect the daily payments under the Velocity Agreement, including the withdrawals of the usurious interest; and (iii) approved the

---

[11] https://www.tmcnet.com/topics/articles/2024/03/26/459097-ai-finance-2024-expert-jay-avigdor-where-we.htm

policies and procedures by which Velocity made it virtually impossible for Jambys to seek reconciliation of its daily Remittances.

274.    Through salary, bonuses, profits, or other distributions by Velocity, Avigdor has benefited from the Velocity Enterprise's funneling of a portion or all of the usurious loan proceeds to Velocity.

### *Velocity*

275.    At all times material hereto, Velocity has been and continues to be responsible for: (i) determining the form of the usurious merchant cash advance agreements used by the Velocity Enterprise; (ii) underwriting the agreements; (iii) determining the Purchase Price, Purchased Amount, and daily Remittances under the agreements; (iv) approving the Velocity Enterprise's entry into the agreements; (v) funding the usurious loans entered into by the Velocity Enterprise; (vi) servicing the usurious loans created thereby; and (vii) collecting upon the unlawful debts therefrom.

276.    Specifically, Velocity: (i) entered into the Velocity Agreement; (ii) funded the amounts advanced to Jambys under the Velocity Agreement by a wire transfer dated August 10, 2023 from its account at Valley National Bank; (iii) communicated with Jambys concerning the loan through email; and (iv) collected the daily Remittances through the ACH withdrawals from Jambys's designated bank account into Velocity's account at Valley National Bank, including the usurious loan interest.

277.    Velocity benefits from the Velocity Enterprise's unlawful activity by receiving a portion or all of the proceeds from the unlawful debts.

### Matt Simmons

278.     As owner and Senior Funding Manager of Simmons Capital, Defendant Simmons has decision-making authority over Simmons Capital.

279.     At all times material hereto, Simmons was responsible for locating and soliciting merchants for the purpose of offering funding and providing the merchants with usurious loans disguised as merchant cash advance agreements on behalf of the Velocity Enterprise.

280.     Simmons facilitated the Velocity Enterprise's operations by acting as a point of contact for updates on Jambys's outstanding balance as well as other general inquiries regarding the Velocity Agreement.

281.     Simmons benefits from the Velocity Enterprise's unlawful activity by receiving a broker's fee and/or a portion of the proceeds from the unlawful debts.

### Simmons Capital

282.     At all times material hereto, Simmons Capital was responsible for locating and soliciting merchants for the purpose of offering funding and providing the merchants with usurious loans disguised as merchant case advance agreements on behalf of the Velocity Enterprise.

283.     In this case, Simmons Capital (i) located and solicited Jambys; (ii) acted as a conduit to provide Jambys's financial information to Velocity for the loan approval process; and (iii) was heavily involved in and constantly copied on Jambys's communications and negotiations with Velocity.

284.     Simmons Capital benefits from the Velocity Enterprise's unlawful activity by receiving a broker's fee and/or a portion of the proceeds from the unlawful debts.

## II.      The United First Enterprise

*(Musheyev, Eliyayev, United First, GFE, GFE NY, Simmons, and Simmons Capital)*

285.      Upon information and belief, GFE is either a trade name or corporate affiliate or alter ego of United First.

286.      The only lender contact information provided in the United First Agreement uses the GFE email domain.[12]   Moreover, the LinkedIn pages of both GFE and its executives show posts advertising United First and its appearances at trade events (ostensibly so as to prey upon unwary new borrowers).[13]   Additionally, the Virginia State Corporation Commission publishes a monthly registry of companies registered to provide sales-based financing in the Commonwealth of Virginia. The most recent version, published on May 8, 2024, identifies "United First, LLC d/b/a Global Funding Experts" at GFE's known headquarters in Long Island City, New York.[14]

287.      Defendant Musheyev is the "Founder & CEO" of GFE and has operated in this capacity since founding GFE in 2014.[15]   His online biography notes that as CEO, he has "responsibility for managing a portfolio that has grown to over $150M in productive assets, while building the company's brand." *Id.*

288.      Defendant Eliyayev is the "Co-Founder" of GFE, and "[s]ince co-founding GFE in 2014, [he] has had responsibility for building, training, and managing a geographically dispersed array of teams that support GFE's end-to-end workflow from client acquisition, through

---

[12] The only lender email addresses identified in the United First Agreement are "underwriting@globalfundingexperts.com" and "AR@globalfundingexperts.com." *See* Ex. D at pp. 1, 5, 7.

[13] *See* https://www.linkedin.com/company/global-funding-experts-gfe/

[14] *See* https://scc.virginia.gov/getattachment/14345d8d-af03-4869-88f3-1e3d42ff4eb4/Sales-based-financing-provider-registrant-report.pdf

[15] *See* https://www.globalfundingexperts.com/about-us/

underwriting, funding, account management, and, as required, collection." Eliyayev's biography further states that "[t]hese teams receive, review, and underwrite hundreds of funding applications per day, making underwriting decisions within hours, and if approved, thereafter, have collective responsibility for funding and managing aspects of over \$150M in productive assets in concert with their sister teams."[16]

289.    Defendant Matt Simmons is an owner and Senior Funding Manager of Simmons Capital Partners.

290.    Defendant Simmons Capital brokered the United First Agreement. *See* Ex. D p.4.

291.    Musheyev, Eliyayev, United First, GFE, GFE NY, Simmons, and Simmons Capital constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

292.    Musheyev, Eliyayev, United First, GFE, GFE NY, Simmons, and Simmons Capital are a group of persons that are associated-in-fact for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the United First Enterprise has the common goal of soliciting, funding, and servicing criminally usurious loans, and collecting the unlawful debts resulting therefrom.

293.    Upon information and belief, since at least 2018 and continuing through the present, the members of the United First Enterprise have had ongoing relations with each other through shared personnel, shared offices in New York, a common email address (@globalfundingexperts), one or more contracts or agreements relating to and for the purpose of originating, underwriting, and servicing criminally usurious loans, and/or collecting the resulting unlawful debts from small businesses throughout the United States, including Jambys.

---

[16] *See* https://www.globalfundingexperts.com/about-us/

294.     The criminally usurious loans, including the loan issued under the United First Agreement, resulted in unlawful debts within the meaning of 18 U.S.C. § 1962(c) and (d), because they violate the applicable criminal usury statute with interest rates that routinely exceed the legal rate under New York Law. Specifically, the annualized rate charged to Jambys under the United First Agreement exceeded **55%**, a rate that is more than twice the maximum twenty-five percent (25%) that is permitted to be charged under New York Penal Law § 190.40.

295.     The United First Enterprise has further engaged in a pattern of collecting and attempting to collect unlawful debt, by, inter alia, filing enforcement actions against borrowers who have fallen victim to the United First Enterprise's schemes. *See, e.g., Global Funding Experts LLC v. MPGW Int'l Co., Inc.*, Index No. E2024006123 (N.Y. Sup. Ct. Monroe Cnty. Apr. 9, 2024); *Global Funding Experts LLC v. Salisbury Sales, Inc.*, Index No. 523924/2022 (N.Y. Sup. Ct. Kings Cnty. Aug. 17, 2022).

296.     The United First Enterprise is comprised of a non-exhaustive list of members who are associated with and/or employed by the Velocity Enterprise as follows:

### *Boris Musheyev and Viacheslav Eliyayev*

297.     As founder and CEO of United First/GFE, Defendant Musheyev is, upon information and belief, involved in and at least partially responsible for determining the general direction of the United First Enterprise.  As detailed in his website biography, Musheyev has "responsibility for managing a portfolio that has grown to over $150M in productive assets, while building the company's brand."[17]

298.     As co-founder of United First/GFE, Defendant Eliyayev is, upon information and belief, involved in and at least partially responsible for determining the general direction of the

---

[17] *See* https://www.globalfundingexperts.com/about-us/#what_do_we_do

United First Enterprise.  As detailed in his website biography, Eliyayev is responsible for overseeing the teams that handle "client acquisition, . . . underwriting, funding, account management, and, as required, collection."  *Id.*

299.    Upon information and belief, in their capacities as the leaders of the United First Enterprise, Musheyev and Eliyayev are involved in and at least partially responsible for creating, approving, and implementing the policies, practices, and instrumentalities of the United First Enterprise to accomplish its common goals and purposes, including: (i) the form of merchant agreements used by the United First Enterprise to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the United First Enterprise's collection of unlawful debts; (ii) the amount and repayment periods of the usurious loans extended by the United First Enterprise to merchants; and (iii) the method of collecting the daily Remittances via ACH withdrawals. All such forms were used to make and collect upon the unlawful loans including, without limitation, the loan extended to Jambys under the United First Agreement.

300.    Musheyev and Eliyayev also have taken actions and directed other member(s) of the United First Enterprise to take actions necessary to accomplish the overall goals and purposes of the United First Enterprise, including personally engaging in and/or directing other member(s) of the United First Enterprise to make loans to merchants and to collect upon the unlawful loans.

301.    For example, Musheyev and Eliyayev: (i) approved the United First Enterprise's brokerage and entry into the United First Agreement and the payment terms thereunder; (ii) authorized the ACH withdrawals used by the United First Enterprise to collect the daily payments under the United First Agreement, including the withdrawals of usurious interest; and (iii) approved GFE's policies and procedures.

302.    Through salary, bonuses, profits, or other distributions received by United First, Musheyev and Eliyayev have benefited from the United First Enterprise's funneling of a portion or all of the usurious proceeds to United First.

### *United First, GFE, GFE NY*

303.    At all times material hereto, United First, GFE, and/or GFE NY have been and continue to be responsible for: (i) determining the form of the usurious merchant cash advance agreements used by the United First Enterprise; (ii) underwriting the agreements; (iii) determining the Purchase Price, Purchased Amount, and daily Remittances under the agreement; (iv) approving the United First Enterprise's entry into the agreements; (v) funding the usurious loans entered into by the United First Enterprise; (vi) servicing the usurious loans created thereby; and (vii) collecting upon the unlawful debts therefrom.

304.    Here, United First, GFE, and/or GFE NY: (i) entered into the United First Agreement; (ii) funded the amounts advanced to Jambys at least partially by way of fourteen bank wire transfers out of a total of seventeen contemplated by the United First Agreement; (iii) communicated with Jambys concerning the loan through email; and (iv) collected the daily Remittances through the ACH withdrawals from Jambys's designated bank account into GFE's bank account, including the usurious interest.

305.    United First, GFE, and GFE NY benefit from the United First Enterprise's unlawful activity by receiving a portion or all of the proceeds from the unlawful debts.

### *Matt Simmons*

306.    As owner and Senior Funding Manager of Simmons Capital, Simmons, upon information and belief, has decision-making authority over Simmons Capital.

307.    At all times material hereto, Simmons was responsible for locating and soliciting merchants for the purpose of offering funding and providing the merchants with usurious loans disguised as cash advance agreements on behalf of the United First Enterprise.

308.    Simmons also facilitated the United First Enterprise's operations by acting as a point of contact for updates on Jambys's outstanding balance as well as other general inquiries regarding the United First Agreement.

309.    Simmons benefits from the United First Enterprise's unlawful activity by receiving a broker's fee and/or a portion of the proceeds from the unlawful debts.

### *Simmons Capital*

310.    At all times material hereto, Simmons Capital was responsible for locating and soliciting merchants for the purpose of offering funding and providing the merchants with usurious loans disguised as merchant case advance agreements on behalf of the United First Enterprise.

311.    In this case, Simmons Capital (i) located and solicited Jambys; (ii) acted as a conduit to provide Jambys's financial information to United First for the loan approval process; and (iii) was heavily involved in and constantly copied on Jambys's communications and negotiations with United First.

312.    Simmons Capital benefits from the United First Enterprise's unlawful activity by receiving a broker's fee and/or a portion of the proceeds from the unlawful debts.

### III.    The CloudFund Enterprise

*(Maczuga, Serebro, CloudFund, Delta Bridge,
Max Recovery, Simmons, and Simmons Capital)*

313.    Upon information and belief, Defendant Maczuga is the CEO, majority owner, and co-founder of Delta Bridge along with Defendant Serebro. Upon information and belief, Maczuga has served as CEO of Delta Bridge from May 2021 until present.

314.    Upon information and belief, Defendant Serebro is the general counsel, part owner, Chief Strategy Officer, and co-founder of Delta Bridge along with Maczuga. The NYAG Complaint further notes that "Serebro is also the sole owner of an affiliated collections firm dedicated to collecting on defaulted Delta Bridge MCAs, called Max Recovery, which previously performed the same function at Yellowstone," and that "Serebro also uses the title of general counsel at Max Recovery, the collections firm he solely owns and manages." In addition, Defendant Serebro is alleged to have "personally invested in hundreds of [the Yellowstone and Delta Bridge] individual MCA transactions as a 'participant', through an entity he owns called VS Ventures."

315.    Defendant Matt Simmons is an owner and Senior Funding Manager of Simmons Capital Partners.

316.    Defendant Simmons Capital brokered the CloudFund Agreement.

317.    Maczuga, Serebro, CloudFund, Delta Bridge, Max Recovery, Simmons, and Simmons Capital constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

318.    Maczuga, Serebro, CloudFund, Delta Bridge, Max Recovery, Simmons, and Simmons Capital are a group of persons that are associated-in-fact for the common purpose of carrying on an ongoing unlawful enterprise (the "CloudFund Enterprise"). Specifically, the CloudFund Enterprise has the common goal of soliciting, funding, and servicing criminally usurious loans, and collecting the unlawful debt resulting therefrom.

319.    Upon information and belief, since at least 2023 and continuing through the present, the members of the CloudFund Enterprise (*i.e*, Maczuga, Serebro, CloudFund, Delta Bridge, Max Recovery, Simmons, and Simmons Capital) have had ongoing relations with each other for the

purpose of originating, underwriting, and servicing criminally usurious loans, and collecting resulting unlawful debts from small businesses throughout the United States, including Jambys.

320.    The criminally usurious loans, including the loans issued under the CloudFund Agreements, resulted in unlawful debts within the meaning of 18 U.S.C. § 1962(c) and (d), because they violate applicable criminal usury statutes with interest rates that routinely exceed the legal rate under New York Law. Here, the annualized rates charged to Jambys under the CloudFund Agreements ranged from over **<u>60%</u>** to nearly **<u>90%</u>**, which are multiple times the maximum twenty-five percent (25%) that is permitted to be charged under New York Penal Law § 190.40.

321.    The CloudFund Enterprise has engaged in a pattern of collecting and attempting to collect unlawful debt, as evidenced by its filing of various lawsuits seeking to enforce MCA agreements made with other merchants over recent years. *See, e.g., CloudFund LLC v. Lola's Landscape Inc.*, Index No. 616855/2023 (N.Y. Sup. Ct. Nassau Cnty. Oct. 17, 2023); *CloudFund LLC v. Next Gen SP LLC*, Index No. 611494/2022 (N.Y. Sup. Ct. Nassau Cnty. Aug. 30, 2022); *CloudFund LLC v. Oakstone Homes, Inc.*, Index No. 705843/2022 (N.Y. Sup. Ct. Queens Cnty. Mar. 16, 2022).

322.    The CloudFund Enterprise is comprised of a non-exhaustive list of members who are associated with and/or employed by the Velocity Enterprise as follows:

### *Bartosz Maczuga and Vadim Serebro*

323.    As the CEO, majority owner, and co-founder of Delta Bridge and CloudFund, Defendant Maczuga, upon information and belief, is involved in and at least responsible for determining the general direction of CloudFund Enterprise.

324.    As the Chief Strategy Officer, general counsel, part owner, and co-founder of Delta Bridge and CloudFund and the sole owner of Max Recovery Group, Serebro, upon information

and belief, is involved in and at least responsible for determining the general direction of the CloudFund Enterprise.

325.    Upon information and belief, in their capacities as the leaders of the CloudFund Enterprise, Maczuga and Serebro are involved in and at least partially responsible for creating, approving, and implementing the policies, practices, and instrumentalities of the CloudFund Enterprise to accomplish its common goals and purposes, including: (i) the form of merchant agreements used by the CloudFund Enterprise to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the CloudFund Enterprise's collection of unlawful debts; (ii) the amount and repayment period of the usurious loans extended by the CloudFund Enterprise to merchants; and (iii) the method of collecting the daily Remittances via ACH withdrawals. All such forms were used to make and collect upon the unlawful loans including, without limitation, the loan extended to Jambys under the CloudFund Agreements.

326.    Maczuga and Serebro also have taken actions and directed other member(s) of the CloudFund Enterprise to take actions necessary to accomplish the overall goals and purposes of the CloudFund Enterprise, including personally engaging in and/or directing other member(s) of the CloudFund Enterprise to make usurious loans to merchants and to collect upon the unlawful loans.

327.    In this case, Maczuga and Serebro: (i) approved the CloudFund Enterprise's entry into the CloudFund Agreements and the payment terms thereunder; (ii) authorized the ACH withdrawals used by the CloudFund Enterprise to collect the daily payments under the CloudFund Agreements, including the withdrawals of usurious interest; and (iii) approved the policies and procedures by which CloudFund made it virtually impossible for Jambys to seek reconciliation of its daily Remittances.

328.    Through salary, bonuses, profits, or other distributions by CloudFund, Delta Bridge, and/or Max Recovery, Maczuga and Serebro have benefited from the CloudFund Enterprise's funneling of a portion or all of the usurious proceeds to CloudFund.

### *CloudFund, Delta Bridge, Max Recovery*

329.    At all times material hereto, CloudFund, Delta Bridge, and/or Max Recovery have been and continue to be responsible for: (i) determining the form of the usurious merchant cash advance agreements used by the CloudFund Enterprise; (ii) underwriting the agreements; (iii) determining the Purchase Price, Purchased Amount, and daily Remittances under the agreement; (iv) approving the CloudFund Enterprise's entry into the agreements; (v) funding the usurious loans entered into by the CloudFund Enterprise; (vi) servicing the usurious loans created thereby; and (vii) collecting upon the unlawful debts therefrom.

330.    In this case, CloudFund, Delta Bridge, and/or Max Recovery: (i) entered into the CloudFund Agreements; (ii) funded the amounts advanced to Jambys under the CloudFund Agreements by way of wire transfers dated January 27, 2023, July 7, 2023, and November 20, 2023; (iii) communicated with Jambys concerning the loan through email; and (iv) collected the daily Remittances through the ACH withdrawals from Jambys's designated bank account into CloudFund's bank account, including usurious interest.

331.    CloudFund, Delta Bridge, and Max Recovery benefit from the CloudFund Enterprise's unlawful activity by receiving a portion or all of the proceeds from the unlawful debt.

### *Matt Simmons*

332.    As an owner and Senior Funding Manager of Simmons Capital, Simmons, upon information and belief, has decision-making authority over Simmons Capital.

333. At all times material hereto, Simmons was responsible for locating and soliciting merchants for the purpose of offering funding and providing the merchants with usurious loans disguised as merchant cash advance agreements on behalf of the CloudFund Enterprise.

334. Simmons also facilitated the CloudFund Enterprise's operations by acting as a point of contact for updates on Jambys's outstanding balances as well as other general inquiries regarding the CloudFund Agreement.

335. Simmons benefits from the CloudFund Enterprise's unlawful activity by receiving a broker's fee and/or a portion of the proceeds from the unlawful debts.

### *Simmons Capital*

336. At all times material hereto, Simmons Capital was responsible for locating and soliciting merchants for the purpose of offering funding and providing the merchants with usurious loans disguised as merchant case advance agreements on behalf of the CloudFund Enterprise.

337. In this case, Simmons Capital (i) located and solicited Jambys; (ii) acted as a conduit to provide Jambys's financial information to CloudFund for the loan approval process; and (iii) was heavily involved in and constantly copied on Jambys's communications and negotiations with CloudFund.

338. Simmons Capital benefits from the CloudFund Enterprise's unlawful activity by receiving a broker's fee and/or a portion of the proceeds from the unlawful debts.

### IV.   The NewCo Enterprise

*(NewCo, MCA Servicing, Simmons, and Simmons Capital)*

339. As discussed above, NewCo Capital Group VI LLC is a New York limited liability company that, upon information and belief, has taken the assumed name (d/b/a) MCA Servicing Company.

340.    Defendant Matt Simmons is an owner and the Senior Funding Manager of Simmons Capital.

341.    Defendant Simmons Capital brokered the NewCo and MCA Servicing Agreements.

342.    NewCo, MCA Servicing, Simmons, and Simmons Capital are a group of persons that are associated-in-fact for the common purpose of carrying on an ongoing unlawful enterprise (the "NewCo Enterprise"). Specifically, the NewCo Enterprise has the common goal of soliciting, funding, and servicing criminally usurious loans, and collecting the unlawful debt resulting therefrom.

343.    Upon information and belief, since at least 2021 and continuing through the present, NewCo, MCA Servicing, Simmons, and Simmons Capital have had ongoing relations with each other through shared personnel, shared offices in New York, common email addresses, and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, and servicing criminally usurious loans, and collecting the resulting unlawful debts from small businesses throughout the United States, including Jambys.

344.    The criminally usurious loans, including the loans issued under the NewCo and MCA Servicing Agreements, resulted in unlawful debts within the meaning of 18 U.S.C. § 1962(c) and (d), because they violate applicable criminal usury statutes with interest rates that routinely exceed the legal rate under New York Law. For example, the annualized rates charged to Jambys under the NewCo and MCA Servicing Agreements ranged from nearly **90%** up to nearly **140%**, which are multiple times the maximum twenty-five percent (25%) that is permitted to be charged under New York Penal Law § 190.40.

345.    The NewCo Enterprise has further engaged in a pattern of collecting and attempting to collect unlawful debt, by, inter alia, filing enforcement actions against borrowers who have

fallen victim to the NewCo Enterprise's schemes. *See, e.g., Simmons Cap. Partners v. Move.Lift.Live LLC*, Index No. E2024007648 (N.Y. Sup. Ct. Monroe Cnty. May 7, 2024); *Simmons Cap. Partners v. Skyhawk Press LLC*, Index No. E2024005326 (N.Y. Sup. Ct. Monroe Cnty. Mar. 27, 2024); *MCA Servicing Co. v. Nic's Painting, LLC*, Index No. 034901/2023 (N.Y. Sup. Ct. Rockland Cnty. Apr. 23, 2024) (holding MCA Servicing's form agreement to be a criminally usurious loan); *MCA Servicing Co. v. Carter Building Co.*, Index No. 035103/2023 (N.Y. Sup. Ct. Rockland Cnty. Oct. 13, 2023); *MCA Servicing Co. v. Cedar Cryo Transp., Inc.*, Index No. 030123/2024 (N.Y. Sup. Ct. Rockland Cnty. Jan. 1, 2024); *MCA Servicing Co. v. Barker*, Index No. 814661/2022 (N.Y. Sup. Ct. Erie Cnty. Apr. 14, 2023); *NewCo Cap. Grp. VI LLC v. Orcus Sys. and Sols. Inc.*, Index No. 035241/2023 (N.Y. Sup. Ct. Rockland Cnty. Oct. 20, 2023). The MCA Servicing Action is also an example of this.

346.    The NewCo Enterprise is comprised of a non-exhaustive list of members who are associated with and/or employed by the Velocity Enterprise as follows:

### *NewCo & MCA Servicing*

347.    At all times material hereto, MCA Servicing, NewCo, and/or Simmons Capital have been and continue to be responsible for: (i) determining the form of the usurious merchant cash advance agreements used by the NewCo Enterprise; (ii) underwriting the agreements; (iii) determining the Purchase Price, Purchased Amount, and daily Remittances under the agreement; (iv) approving the NewCo Enterprise's entry into the agreements; (v) funding the usurious loans entered into by the NewCo Enterprise; (vi) servicing the usurious loans created thereby; and (vii) collecting upon the unlawful debts therefrom.

348.    Specifically, NewCo and/or MCA Servicing: (i) entered into the NewCo Agreement and MCA Servicing Agreements; (ii) funded the amounts advanced to Jambys by way

of bank wire transfers dated January 27, 2023 for the NewCo Agreement, as well as August 24, 2023 and October 5, 2023 for the MCA Servicing Agreements; (iii) communicated with Jambys concerning the loan through email; and (iv) collected the daily Remittances through the ACH withdrawals from Jambys's designated bank account into their bank account(s), including the usurious interest.

349.    NewCo and/or MCA Servicing benefited from the NewCo Enterprise's unlawful activity by receiving a portion or all of the proceeds from the unlawful debts.

### Matt Simmons

350.    As an owner and Senior Funding Manager of Simmons Capital, Simmons, upon information and belief, has decision-making authority over Simmons Capital.

351.    At all times material hereto, Simmons was responsible for locating and soliciting merchants for the purpose of offering funding and providing the merchants with usurious loans disguised as merchant cash advance agreements on behalf of the NewCo Enterprise.

352.    Simmons also facilitated the NewCo Enterprise's operations by acting as a point of contact for updates on Jambys's outstanding balances as well as other general inquiries regarding the MCA Servicing Agreements and the NewCo Agreement.

353.    Simmons benefits from the NewCo Enterprise's unlawful activity by receiving a broker's fee and/or a portion of the proceeds from the unlawful debts.

### Simmons Capital

354.    At all times material hereto, Simmons Capital was responsible for locating and soliciting merchants for the purpose of offering funding and providing the merchants with usurious loans disguised as merchant case advance agreements on behalf of the NewCo Enterprise.

355.    In this case, Simmons Capital (i) located and solicited Jambys; (ii) acted as a conduit to provide Jambys's financial information to NewCo and/or MCA Servicing for the loan approval process; and (iii) was heavily involved in and constantly copied on Jambys's communications and negotiations with NewCo and/or MCA Servicing.

356.    Simmons Capital benefits from the NewCo Enterprise's unlawful activity by receiving a broker's fee and/or a portion of the proceeds from the unlawful debts.

### C.    Interstate Commerce

357.    At all times material hereto, the MCA Enterprises have been engaged in interstate commerce and use the instrumentalities of interstate commerce in their daily business activities.

358.    Specifically, members of the MCA Enterprises maintain offices in New York, New Jersey, and Florida, and use personnel based in these offices to originate, underwrite, fund, service, and collect upon the usurious loans made by the MCA Enterprises to entities in New York and Delaware (including Jambys), as well as to extract contractual personal guarantees from individuals in New York and North Carolina (including the Jambys Officers), and throughout the United States, via extensive use of interstate emails, mail, wire transfers, and bank withdrawals processed through automated clearing houses.

359.    In the present case, all relevant communications and transactions between Jambys and the members of the respective MCA Enterprises were by interstate email and mail, wire transfers or ACH debits, and/or other interstate wire communications. Specifically, the MCA Enterprises used interstate emails to originate, underwrite, service, and collect upon the MCA Agreements, fund the advances under the MCA Agreements, and collect the daily Remittances via interstate electronic ACH debits.

D.    **Injury and Causation**

360.    Jambys has and will continue to be injured in its businesses and property by reason of the MCA Lenders' violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial. The injuries to Jambys directly, proximately, and foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(c) include, but are not limited to, the hundreds of thousands of dollars paid by Jambys to the MCA RICO Defendants, or otherwise collected by the MCA RICO Defendants, on account of the usurious and otherwise unenforceable MCA Agreements, and attorneys' fees and costs (including those attorneys' fees and costs associated with exposing and prosecuting MCA RICO Defendants' unlawful activities).

361.    Pursuant to 18 U.S.C. § 1964(c), Jambys is entitled to treble damages, plus costs and attorneys' fees from the MCA Lenders.

## COUNT NINE

**(Conspiracy under 18 U.S.C. § 1962(d) – Against the MCA RICO Defendants)**

362.    Jambys repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

363.    The MCA RICO Defendants, through their respective enterprises, have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to participate in an endeavor that violated 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

364.    By and through each of the MCA RICO Defendants' respective enterprises and business relationships therein with one another, their close coordination with their respective fellow enterprise members in the affairs of each respective enterprise, and communicated with their respective fellow enterprise members concerning the underwriting, funding, servicing, and

collection of the unlawful loans, including the MCA Agreements, each MCA RICO Defendant knew the nature of their respective enterprise and each MCA RICO Defendant knew that their respective enterprise extended beyond their own individual role.  Moreover, through the same connections and coordination, each MCA RICO Defendant knew that the other MCA RICO Defendants involved in the same enterprise were engaged in a conspiracy to collect upon unlawful debts that violated 18 U.S.C. § 1962(c).

365.    Each MCA RICO Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of their respective enterprise's affairs in order to collect upon unlawful debts, including the MCA Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each MCA RICO Defendant was a knowing, willing, and active participant in their respective enterprise and its affairs, and each of the MCA RICO Defendants shared a common purpose with their fellow enterprise members, namely, the orchestration, planning, preparation, and execution of the endeavor to solicit, underwrite, fund, and collect upon unlawful debts, including the MCA Agreements.

366.    The participation and agreement of each MCA RICO Defendant was necessary to allow the commission of their respective enterprise's endeavors.

367.    Jambys has been and will continue to be injured in its businesses and property by reason of the MCA RICO Defendants' violation of 18 U.S.C. § 1962(d), in an amount to be determined at trial.  The injuries to Jambys directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, the hundreds of thousands of dollars paid by Jambys to the MCA RICO Defendants, or otherwise collected by the MCA RICO Defendants, on account of the usurious and otherwise unenforceable

MCA Agreements, and attorneys' fees and costs (including those attorneys' fees and costs associated with exposing and prosecuting the MCA RICO Defendants' unlawful activities).

   368. Pursuant to 18 U.S.C. § 1964(d), Jambys is entitled to treble damages, plus costs and attorneys' fees from the MCA RICO Defendants.

WHEREFORE, the Debtors pray the Court to enter an order:

a. Declaring that the automatic stay applies to the Loan Actions against the Jambys Officers and enjoining those Loan Actions against the Jambys Officers;

b. Declaring that the MCA Agreements are criminally usurious and void;

c. Directing the MCA Lenders to cease all collection efforts under the MCA Agreements;

d. Directing the MCA Lenders to return all payments made by Debtors to the MCA Lenders, including all payments towards principal, interest, and fees;

e. Declaring that any liens filed pursuant to or in connection with the MCA Agreements are void and have no priority;

f. Avoiding and restoring all Fraudulent Transfers;

g. Avoiding and restoring all Preferential Transfers;

h. Directing the MCA Lenders to pay compensatory damages to the Debtors;

i. Awarding treble damages;

j. Awarding attorneys' fees and costs; and

k. All other relief that this Court deems just and proper.

Dated:  June 4, 2024
        Wilmington, Delaware

**PASHMAN STEIN WALDER HAYDEN, P.C.**

*/s/ Joseph C. Barsalona II*

Joseph C. Barsalona II (No. 6102)
1007 North Orange Street 4th Floor #183
Wilmington, DE 19801-1242
Telephone: (302) 592-6496
Email: jbarsalona@pashmanstein.com

-and-

Denise Alvarez (admitted *pro hac vice*)
Joshua P. Law (admitted *pro hac vice*)
Court Square
21 Main Street, Suite 200
Hackensack, New Jersey 07601
Email: dalvarez@pashmanstein.com
       jlaw@pashmanstein.com

*Counsel to the Plaintiffs*

## **VERIFICATION**

I, John Tate Ambrose, certify that I am a duly authorized representative of the Plaintiffs.  I have read the foregoing Verified Complaint and can attest that the factual allegations contained in the foregoing paragraphs are accurate to the best of my knowledge.  I am informed and believe that the foregoing information is true and accurate based upon my own knowledge and my review of the business records maintained by the Plaintiffs in the regular course of their business, except as to the matters therein stated to be alleged upon information and belief; and as to those matters I believe them to be true.


Dated:    June 4, 2024                                  **Jambys, Inc.; Jambys NYC, Inc.**
          New York, NY


                                                        */s/ John Ambrose*
                                                        John Ambrose
                                                        President & Co-CEO